## Williams v. Riddle.

(Decided November 22, 1911.)

### Appeal from Hopkins Circuit Court.

1. Slander.—There is a marked distinction between slander and libel; many things are actionable when written or printed and published, which would not be actionable if merely spoken, without averring and proving special damage.

2. Libel.—Any written or printed publication which tends to degrade or disgrace the person about whom it is written or printed, or which tends to render him odious, ridiculous or contemptible in the estimation of his friends, or acquaintances, or the public, is libelous.

3.  Slander.—Words are slanderous, or actionable per se, only in
    case; where they are falsely spoken, and (1) impute the com-
    mission of a crime involving moral turpitude for which the
    party might be indicted and punished; or (2) impute an infec-
    tious disease likely to exclude him from society; or (3) impute
    unfitness to perform the duties of an office or employment; or
    (4) prejudice him in his profession or trade; or (5) tend to dis-
    inherit him.  In all other cases spoken words are either (a) not
    actionable at all; or are only actionable (b) on proof of special
    damage.
4.  Slander.—It is not slanderous per se to say of another, "He is
    a damn negro and his mother was a mulatto."
5.  Slander—Special Damages.—In an action for defamatory words
    not actionable per se, plaintiff cannot recover unless the
    proof shows that the special damage alleged is the natural, im-
    mediate, and legal consequence of the charge, and due exclu-
    sively to the publication by defendant.  The special damage must
    flow from impaired reputation; it must be a loss of a pecuniary
    character, or the loss of some substantial or material advantage.
6.  Slander—Special Damage.—Where a petition states that the de-
    fendant falsely spoke of and concerning the plaintiff, "he is a
    damn negro and his mother was a mulatto," and that as a direct
    and proximate result of said false statement he was permanently
    deprived of the association of a young lady of one of the best
    families of the neighborhood, and of all other young ladies of like
    families; that his standing in a social and financial way was
    greatly damaged; that he was no longer permitted to associate
    with the best people of the neighborhood, and that said false
    and malicious statement degraded and reduced his character and
    reputation in the estimation of his friends and the public gen-
    erally, and rendered him odious, ridiculous and contemptible, it
    did not state a case authorizing tne recovery of special damages.

GIBSON & KINCHELOE for appellant.

LETCHER R. FOX for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

The question for decision is this: Was appellee liable
in damages for slander when he said of and concerning
appellant, "W. M. Williams is a damn negro and his
mother was a Mulatto?" The trial judge sustained a de-
murrer to the petition; and the appellant having de-
clined to plead further, the petition was dismissed, and
Williams appeals.

There is a marked distinction, probably the result of
some historical accident, between slander and libel.  An
action may be maintained for words written, for which

an action could not be maintained if they were merely spoken.

In Pollard v. Lyon, 91 U. S., 225, Mr. Justice Clifford said:

"Actionable words are, doubtless, such as naturally imply damage to the party; but it must be borne in mind that there is a marked distinction between slander and libel, and that many things are actionable when written or printed and published which would not be actionable if merely spoken, without averring and proving special damage."

In libel, any defamatory matter is prima facie libelous, while the same matter, when spoken, might require proof of special injury or damage to sustain a recovery. This distinction has been made between written and spoken slander as far back as to the time of Charles the Second, and the difference has been recognized by the courts for at least two centuries. Thorley v. Lord Kerry, 4 Taunt, 364, 8 Eng. Rul. Cas., 9; Colby v. Reynolds, 6 Vt., 489; 27 Am. Dec., 574; McGee v. Wilson, Litt. Sel. Cas. 188; Shelton v. Nance, 7 B. Mon., 129.

In Riley v. Lee, 88 Ky., 603, it was said any written or printed publication which tends to degrade or disgrace the person about whom it is written or printed, or which tends to render him odious, ridiculous, or contemptible in the estimation of his friends, or acquaintances, or the public, is libelous. The case before us is, however, one of slander.

Sedgwick in his "Elements of the Law of Damages," (2nd Ed.) p. 152, says:

"Special damage, also called special or particular injury, is, properly speaking, the kind of injury which gives a right of action otherwise non-existent. In slander, many spoken words are not in themselves actionable; they do not, in law, import injury. But if the plaintiff shows that they have caused him a special injury, he may maintain an action."

Actionable words are, therefore, of two kinds: (1) those that are actionable in themselves, without proof of special damage or injury; and (2) those that are actionable only by reason of some actual special damage or injury sustained by the party slandered.

Sedgwick states the classification as follows:

"The action of slander lies for oral defamation. In libel, mere proof of publication is sufficient. But of spoken words the law takes a very different view. In-

sulting language or conduct alone is, as already explained, never a ground for damages. Indeed, it has been expressly decided, that although insulting language or conduct may aggravate an assault, it is not itself an assault. It is clear that if an action lay for all inconsiderate, vituperative, reproachful or condemnatory words, it would lead to great abuses, and fill the courts with absurd and trivial suits. It is equally clear that for words naturally and necessarily producing injury, an action must lie. But a third class of cases also exists where the words, though not in themselves such as naturally lead to an inference of damage, do, as a matter of fact, produce it, and in this case the person injured has a clear right to redress. Had the law of defamation developed itself in what may be termed a natural way, the cases would have classified themselves under this head in accordance with the actual facts; but an arbitrary rule introduced into the law of England in the early times has, to a certain extent, made the law of slander artificial. Instead of inquiring, under the rule of certainty and proximate cause, into the effect of the words spoken, the courts early laid it down as a matter of law that in the following cases only were words slanderous, or actionable per se:

1. Words falsely spoken imputing the commission of a crime involving moral turpitude, for which the party might be indicted and punished;

2. Words imputing an infectious disease, likely to exclude him from society;

3. Words imputing unfitness to perform the duties of an office or employment;

4. Words prejudicing him in his profession or trade;

5. Words tending to disinherit him.

"In all other cases spoken words are either (a) not actionable at all, or only actionable (b) on proof of special damage."

This classification is recognized in the leading case of Pollard v. Lyon, 91 U. S., 225.

The law of slander is, therefore, much narrower in its scope and operation than the law of libel. Thus, in Caldwell v. Abbey, Hardin 529, it was held that no action could be maintained for calling a man "a damned rogue"; and a like ruling was made in Smalley v. Anderson, 4 T. B. M., 367, where the plaintiff charged the defendant with being a liar. If, however, the words

charge a felony, or an offense indictable and punishable by fine or imprisonment, though made in general words only, they come within the first head of the classification above given, and are actionable per se. McNamara v. Shannon, 8 Bush, 557; Lemons v. Wells, 78 Ky., 117.

We must, therefore, first inquire whether the words used are actionable per se, and if not, does the petition state a case of special injury or damage.

Are the words used in this case actionable per se?

It is only when oral charges of dishonesty, rascality or general depravity are uttered or spoken of a person in his business or employment, or impute to him the commission of a crime, that they are actionable per se.

In the early and leading case of Brooker v. Coffin, 5 Johns., 188, 4 Am. Dec., 337 (1809), the following rule was given as the test:

"In case the charge, if true, will subject the party charged to an indictment for a crime involving moral turpitude, or subject him to an infamous punishment, then the words will be, in themselves, actionable."

Cooley says that this test has been accepted and applied so often and so generally that it may now be accepted as settled law. ("Torts" p. 229.) It has been so accepted and acted upon in the repeated decisions of this Court.

In Craig v. Pyles, 101 Ky., 593; Peters v. Garth, 20 Ky. L. R., 1934; Feast v. Auer, 28 Ky. L. R., 794; 90 S. W. 564, 4 L. R. A. (N. S.) 560, and Schurick v. Kollman, 50 Ind., 336, opprobious epithets against women, not amounting to charges of unchastity, were held not to be actionable, because they did not come within any one of the heads of the classification of actionable words above given; and although these rulings might seem strange and harsh, they are, nevertheless, in conformity with the general line of decisions upon this subject. At common law imputations of unchastity against a female were not actionable per se. This phase of the rule has not, however, passed without a strong protest from some of the courts. Thus, in Landerback v. Moore, decided in 1817 by the Supreme Court of Ohio, and reported in Tappan's Reports, Appendix A, page 296, Judge McLean said:

"It would be difficult for an individual, who had never been initiated into any of the mysteries of the common law, to believe, that the same courts, who have so repeatedly sanctioned, in their decisions, the above principles, have as often decided, that the common law gave no re-

dress for words charging a female with incontinence. In all the arena of slanders, there is no shaft more deadly than this—the virtues of female innocence are not proof against its assault—at its touch every charm is dissolved —every prospect withers. Its destruction is more cruel, and more complete, than death. But, as the crime is not punishable at common law, these courts can give no reparation for the injury. Incontinence is punished in England by the spiritual court—to this court must the complainant resort.· If the charge be true she is liable to do penance to the church; therefore, the spiritual church takes jurisdiction, and investigates the charge with as much solemnity, and inflicts a punishment on the person falsely charging, perhaps not more severe than if he called the plaintiff a heretic.''

In this respect, however, the law has grown along the line adopted by Judge McLean, and in England, since 1891, and in many of the States, including Kentucky, it is now made actionable, by statute, to impute a want of chastity to a female, and without allegation or proof of special damage; and neither is it necessary that the words should make the charge in express terms. Ky. Stats., Sec. 1; Lyons v. Stratton, 102 Ky., 317: Nicholson v. Rust, 21 Ky. L. R., 647; Nicholson v. Dunn, 21 Ky. L. R., 643; Morris v. Curtis, 20 Ky. L. R., 56; Nicholson v. Merritt, 109 Ky., 369.

Since this State has, with the above exception, adhered to the general rule of the common law above given, in determining what slanderous words are actionable per se, it would seem to be unnecessary in this case to do more than point out the scope of the rule, and the general application of it in some of the principal cases.

It has been held that it is not actionable, per se, to say of a person that he is a rogue, a rascal, a scoundrel, a villain, a cheat, a swindler, a black-leg, a pimp or a loafer. (25 Cyc. 267.)

In Mills v. Taylor, 3 Bibb., 469, it was held that the words, ''You came from Canada to swindle the people of Kentucky out of their money,'' were not actionable; while in Martin v. Melton, 4 Bibb., 99, a similar ruling prevailed where one said of another, ''You have sworn a lie, and I can prove it,'' and it was not shown the charge was made concerning the oath in some judicial proceeding.

We are not entirely without precedents, however, concerning the use of these precise words. In some of

the early cases in South Carolina, decided before slavery was abolished, it was held to be actionable to call a white person a mulatto, on the ground, however, that under the laws of that State a mulatto was deprived of all his civil rights and was liable to be tried in all cases without a jury. Eden v. Legare, 1 Bay, 171 (1791); Wood v. King, 1 Nott & M., 184 (1817); Atkinson v. Hartley, 1 McChord, 203 (1821). And in Flood v. News & Courier Co., 71 S. C., 112; 4 A. & E. Ann. Cas., 685, decided in 1905, it was held to be libelous per se for a newspaper to publish a white man as a negro; but this was a case of libel, where, as above pointed out, the rule is stronger against the defendant, than in cases of spoken words. The same rule was applied in libel cases in Louisiana, where the technical distinctions of the common law as to words actionable per se, and words not actionable per se, are not recognized. Sportono v. Flourichon, 40 La. Ann., 423; Upton v. Times-Democrat Pub. Co., 104 La. Ann., 141 (1900).

On the other hand, in Barrett v. Jarvis, 1 Ohio, 83, Tappan, 211, decided in 1818, it was held not to be actionable to say of one that he is "akin to negroes."

In that case the court said:

"And why should the action lie for imputing a kindred with the negro race? Is it because they are slaves? I presume not; the Russian peasant, the Polish serf, and recently the feudal villain were alike slaves—who is there of European extraction, who can be sure that no one of his ancestors was bought and sold like the cattle of a feudal lord? And surely it could not be imagined to be slanderous to charge one with being of kin to the Russian boor or Slavonian serf.

"Is it because the negro is black? But on this ground, the action should as well lie for imputing kindred with the native of Mallabar, and many other parts of India; with the Brazilian, the Californian, the New Hollander, the Laplander, the Greenlander, who are all of a swarthy hue and many as black as the native of Congo. And if being of kin to negroes is a slanderous imputation, it must be so, to say of a person that he is of kin to a Quinteron. a name used in the West Indies for a person who is fifteen-sixteenths white and one-sixteenth black, for this would be to charge him with being of kin to the negro; and yet the Quinteron is free by law, even in the Spanish colonies, and can not be distin-

guished in external appearance from the fairest European or American.

"Is it because blacks and mulattoes are subject to legal disabilities? That a person must be a free white male to be an elector? And the imputation of being of kin to negroes might tend to deprive a man of the elective franchise? It can not be; because it is no slander to say of a man that he is not a qualified elector, as it would not be to say of a woman that she is not a free white male.

"I fully agree with the court in the case of Row v. Clargis, Sir Thomas Ray, Rep., 432, 'that the law doth alter with the time,' when the sense of words alter, as in the cases then put, and in all cases coming within the like reason; but before I can decide that words of this kind are slanderous, I must be satisfied that they are of very different import from what they now appear to be; besides, if the law of slander is to be thus extended, I do not see where we are to stop; we may have actions of slander for calling persons Irish, or French, or Yankees, if persons who are so called, feel their pride and self-importance wounded by the imputation."

In Johnson v. Brown, 4 Cr. C. C., 235, 13 Fed Cas., No. 7375, decided in the District of Columbia in 1832, the alleged slanderous words were that plaintiff "is a yellow negro, a villain and a liar," coupled with other degrading epithets. In holding that these words were not actionable, Chief Judge Cranch said:

"The words spoken do not charge that the plaintiff, being a free negro or mulatto, inter-married with a white woman, but merely that the plaintiff was a yellow negro. They do not charge the plaintiff with any offense; nor do they charge him with being in any condition which subjects him to legal disabilities. Neither the Constitution of Maryland, nor any statute of that State, or of the United States, deprives a colored person, merely as such, of any civil rights of a citizen.

"It is true that in the slaveholding states, a general rule of evidence has been adopted, by which every person having negro blood, is presumed to be a slave until the contrary is proved; and such a person may be liable to some inconvenience in proving his freedom; but whether his liability to that inconvenience, is sufficient ground to make the words actionable, I have great doubt. They contain no imputation of crime, nor of

moral turpitude; and mere words of disgrace, unless written and published, are not actionable.

"It is, indeed, actionable to say of a man he is excommunicated; but it is because he is liable to the writ de excommunicato capiendo; so, to say that he is outlawed; for he is liable to the writ of capias utlegatum. But to say of a man that he is a yellow negro, does not subject him to any arrest to which a white man is not equally liable."

This opinion refers to the older South Carolina cases, and points out that they were decided upon the ground heretofore stated.

· In McDowell v. Bowles, 53 N. C., 184 (8 Jones ·L.), decided in 1860, the defendant had said that the plaintiff, a Baptist minister of the gospel, "was· a free negro."

In sustaining a non-suit, the court said:

"We are not aware of any class of defamatory words, which are held to be actionable, that would embrace the language complained of in this case. The three classes most usually found in elementary books, are:

"1. Words that impute a crime or a misdemeanor, punishable by an infamous penalty;

"2. Words that impute a contagious disease, by which the party impugned would be excluded from society.

"3. Words derogatory to one in respect to his office, profession or calling.

"The case before us is not embraced in any of these classes. It is obviously not in the first. It is not in the second, for the reason that this class has been strictly confined to the imputation of certain diseases of a loathsome or pestilential nature. It is not in the third, because the offensive language is not spoken of the plaintiff in respect to his calling, which is indispensable to the actionable character of words in that class. It is stated in the declaration, that the plaintiff was a minister of the gospel. Conceding this to be one of the callings which falls within the rule of law in respect to slander (which is by no means certain), yet, its sacred character will not make language actionable, which would not be so, if used of a private person, unless such language be of and concerning him in his capacity of minister.

"Thus stands the law, as we conceive, in respect to

words alleged to be actionable of themselves; with respect to all other disparaging words, outside of the limitation prescribed, special damage must be alleged and proved.''

Under both authority and reason, we are clearly of opinion that the words used in this case which charged that plaintiff was ''a damn negro and his mother was a Mulatto,'' were not actionable, per se.

2. It is insisted, however, that although the words be not actionable per se, the petition, nevertheless, shows special injury and damage, which are sufficient to support the action. As special damage, appellant alleges that immediately before and at the time the words were used, he was paying his respects to, waiting on, going with, and keeping the company of a young lady who was of one of the best families of the neighborhood, and that as a direct and proximate result of the said false statement, he was thereafter permanently deprived of the association, respect and company of said young lady, and of all other young ladies of the best families in said neighborhood; that his standing in a social and financial way was greatly damaged; that he was no longer permitted to associate with the best people of the neighborhood, and that said false and malicious statement degraded and reduced his character and reputation in the estimation of his friends and the public generally, and rendered him odious, ridiculous and contemptible.

The rule governing such cases is stated as follows in 25 Cyc., 525:

''In an action for defamatory words not actionable per se, plaintiff can not recover, unless the proof shows that the special damage alleged is the natural, immediate, and legal consequence of the charge, and due exclusively to the publication by defendant.

''The special damage must flow from impaired reputation. It must be a loss of pecuniary character, or the loss of some substantial or material advantage. Thus, loss of fuel and clothing previously gratuitously furnished, the refusal of civil entertainment at a public house, loss of a marriage, loss of substantial hospitality of friends or third persons, loss of a customer, or a general falling off in business, a refusal of credit, or loss of profitable employment is sufficient evidence of special damages. But evidence of the loss of consortium vicinorum, or evidence that plaintiff's relatives slighted and shunned him, is not sufficient to show special dam-

ages. Neither mental suffering nor physical sickness will alone be sufficient to show special damages to support an action for words not actionable per se."

In Beach v. Ranney, 2 Hill, 309, the New York Court of Appeals stated the rule as follows:

"It is not enough that he has suffered pain of mind, lost the society or good opinion of his neighbors, or the like, unless he has been injured in his estate or property. It is enough, however, that the slander has prevented the party from receiving something of value which would otherwise have been conferred, though gratuitously."

Special damage is the gist of an action for slander, except for words which are actionable per se; and the special damage necessary to support an action for defamation, when the words spoken are not actionable in themselves, must be the loss of some material, temporal advantage. Roberts v. Roberts, 33 L. J., Q. B., 249; 5 B. & S., 384; 8 Eng. Rul. Cas., 395.

The foregoing rule was recognized by this court in The Windish-Muhlhauser Brewing Co. v. Bacon, 21 Ky. Law Rep., 928, where we said:

"The words charged were not actionable per se.— The special damage recoverable must be limited to the actual or constructive pecuniary loss.—The measure of recovery for compensatory damages was the actual pecuniary loss sustained by appellee by reason of the charge, if it were false.—The special damage was the gist of the action, and if he was not actually injured he should not have recovered. The rule is otherwise where the words are actionable per se."

Measured by this standard, the petition does not state a case of special injury or damage. No pecuniary loss, or loss of marriage is shown. At most, the allegations of the petition show a loss of the companionship of acquaintances, and this, as we have seen, is not such an injury as can be made the basis of a recovery. To sustain a recovery plaintiff must not only show damage, but the damage must be the natural and probable consequence of the words used. Lynch v. Knight, 9 H. L. Cas., 591; 8 Eng. Rul. Cas., 387. The damage here alleged is too remote, uncertain and speculative, to claim the attention of a court. Fields v. Colson, 93 Ky., 348.

The judgment dismissing the petition is affirmed.