## Axton Fisher Tobacco Company v. Evening Post Company, et al.

(Decided March 9, 1916.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, First Division).

1. Libel and Slander—Publication Per Se Libelous.—Where a publication is libelous per se, it is actionable without averment of special damage, and in such a case the inference of damage is raised by the law and need not be pleaded or proved.

2. Libel and Slander—Libelous Nature of Publication.—When language is used concerning a person or his affairs which necessarily causes or naturally and presumably will occasion pecuniary damage to the person of whom it is spoken, it will be libelous per se.

3. Libel and Slander—Designation of Person Libeled.—When the publication, reading the whole of it, is plainly directed at a person, he may maintain an action for libel as freely as if he were particularly named and described in the publication.

4. Libel and Slander—Definition of Libel.—A written or printed publication that tends to degrade or disgrace the person about whom it is written, or that tends to render him odious, ridiculous or contemptible in the estimation of his friends and acquaintances, is per se actionable libel.

5. Libel and Slander—Definition of Slander.—Words to constitute actionable slander must impute the commission of a crime, or infectious disease, or unfitness to perform the duties of an office,

or prejudice the person in his profession or trade, or tend to disinherit him.

6. Libel and Slander—Distinction Between Obtains With Respect to Corporations.—The distinction between libel and slander obtains as fully in suits against corporations as it does in suits against individuals.

7. Libel and Slander—Corporation May Maintain Action for.—A corporation may maintain an action for libel or slander when the effect of the words or publication is to injure it in a business way. And if the publication would be libelous if it concerned a merchant or trader in his business, so would it be libelous if it concerned a corporation in its business. It is the injury to the business that constitutes the gravamen of the offense.

8. Libel and Slander—Actionable Publication Respecting Corporation.—If the publication is of such a nature as to reasonably and naturally render the corporation odious and contemptible in the estimation of the public or its patrons and thereby deprive it of the favor and esteem of the public and the patronage of its customers, it will be actionable per se.

9. Libel and Slander—Publication Concerning Corporation—When Not Libelous Per Se.—A publication that merely charges a corporation with paying less wages and requiring its employes to work more hours per day than other corporations, is not per se libelous, nor is a publication charging that the sanitary conditions of a corporation are not as good as the sanitary conditions of other like corporations.

10. Libel and Slander—Actionable Words Concerning a Corporation.—A publication charging that a corporation employed a negro man as boss over white girls was libelous per se.

11. Libel and Slander—Judicial Notice.—Courts will take judicial notice of the social order and domestic economy of the State in respect to the attitude of the white race toward the negro race.

12. Libel and Slander—"Unfair List"—Publication Charging That Corporation Had Been Placed On.—A publication charging that a corporation had been placed on the "unfair list," when read in connection with the inducement and innuendo, was libelous per se.

13. Libel and Slander—"Scab" Printing—When Publication Libelous Respecting Corporations.—A publication charging that a corporation had its advertising matter printed in "scab" shops, when read in connection with the inducement and innuendo, was libelous per se.

14. Libel and Slander—"Unfair List"—"Scab" Printing.—Ordinarily to publish of a business house that it had been put on the "unfair list," or that it had its printing done in "scab" shops, would not be libelous per se, but may be made so by the inducement and innuendo.

15. Libel and Slander—Reference to Inducement and Innuendo.—The inducement and innuendo may be looked to in connection with the publication for the purpose of ascertaining its meaning and effect.

16. Libel and Slander—Office of Inducement.—It is the office of the inducement to narrate the extrinsic circumstances which, coupled with the language published, affect its construction and render it actionable, when standing alone it would not be.

17. Libel and Slander—Office of Innuendo.—Where language is ambiguous, it is the function of the innuendo to point out the meaning, and while the innuendo cannot enlarge or extend the meaning of the published words, it may show that the circumstances under which the publication was made rendered it libelous.

18. Libel and Slander—Injury to Business.—Words published of a business concern that have a direct tendency to alienate from it the patronage of a large class of its customers, although others of its patrons may not take offense, may be made the basis of an action for libel.

BURTON VANCE for appellant.

HUMPHREY, MIDDLETON & HUMPHREY and GIBSON & CRAWFORD for appellees.


OPINION OF THE COURT BY JUDGE CARROLL.—Reversing.

This is a libel suit brought by the Axton Fisher Tobacco Co., a corporation engaged, in Louisville, Ky., in manufacturing and selling smoking and chewing tobacco and especially in the manufacture and sale of the brands known as "Old Hill Side" and "Booster Twist." The defendants are the Evening Post Co., the publishers of the Evening Post, a daily newspaper in the city of Louisville having a wide circulation in that city and elsewhere, and Richard W. Knott, editor, and Lewis C. Humphrey, associate editor of the paper.

To the petition and amended petition of the plaintiff general demurrers were filed by the defendants and sustained, and, declining to plead further, the petitions were dismissed, and the plaintiff brings the case to this court.

The demurrers admit the truth of all the material averments in the petition and amended petition, and so the only question before us is, did these pleadings, assuming the averments to be true, state a good cause of action against the defendants?

The petition, after averring that the plaintiff was engaged in manufacturing and selling smoking and chewing tobacco, further averred that it "had been for many years prior thereto especially engaged in the manufacture and sale of its brands of smoking and twist tobacco widely

and favorably known as 'Old Hill Side' and 'Booster Twist,' and it had, on and prior to said dates, acquired, enjoyed and deserved a good reputation with the trade and the public as a manufacturer of tobacco, and especially of said brands of tobacco, and had built up, enjoyed and deserved an extensive demand for, and sale of, its said products and brands of tobacco, from which it received a valuable and ever increasing profit.

"That in the introduction of its said brands of tobacco 'Old Hill Side' and 'Booster Twist' to the trade and the public throughout the United States, and in establishing their said good reputation and in acquiring said good reputation with, and good will of the trade and public, as a manufacturer of tobacco, and as the manufacturer of said brands of tobacco, it expended a great many thousands of dollars, and said brands, and plaintiff's reputation and good will therein, constituted plaintiff's most valuable asset, and was on said several dates fairly and reasonably worth the sum of three hundred thousand dollars.

"That it had, for many years, at all times operated a union factory and employed union labor in the manufacture of its said tobacco, and had at all times paid its employes engaged in its manufacture the union scale of wages, and in many instances largely in excess of the union scale, and at all times and in all ways dealt fairly and justly with its employes; and by reason of these facts it had on said dates acquired and enjoyed a good reputation with, and the good will of, organized labor and wage earners in Kentucky and throughout the United States, and had especially acquired with them a valuable reputation and good will as the manufacturer of, and for 'Old Hill Side' and 'Booster Twist' as union made tobaccos, and had built up and enjoyed an extensive demand for, and sale of said tobacco to them, which constituted the larger part of the demand for said brands.

"That at all the times hereinbefore and hereinafter mentioned or referred to plaintiff was conducting and operating its said business and its said factory as a unionized factory pursuant to the terms of a contract existing between it and the Tobacco Workers' International Union, a corporation organized and existing under an act of the Congress of the United States of America, by which said union granted to it the right to place on tobacco manufactured by it the label of said union and bound itself to

furnish all the said labels required by plaintiff for said purpose, and in consideration of which plaintiff obligated and bound itself to said union, among other things, 'That all persons employed by it in the manufacture of tobacco should be members of the Tobacco Workers' International Union exclusively,' and 'That it would pay to its said employes the scale of wages approved of and agreed to between it and said union.' That at all said times a scale of wages was in force between it and said union under said contract which had been approved and agreed upon between it and said union.

"That the right granted it by said contract to affix said union label to tobacco manufactured by it was a very valuable asset to it in its said business, and by the terms of said contract a failure upon its part to strictly comply with its obligations to pay to its employes wages according to the said scale of wages agreed upon would operate to deprive it of the further use of said union label."

In paragraph 1, it was averred:

"That in several editions of the Evening Post printed, published and circulated by the defendants on October 4, 1913, 'they wilfully, knowingly and maliciously published of and concerning the plaintiff and its business of manufacture of tobacco; of and concerning the wages paid by it in its factory to its employes; of and concerning its methods of conducting its business, and of and concerning the character and kind of men it employed as foremen in its factory, the following false and defamatory statements:

" 'Axton (meaning plaintiff) has a negro foreman over white men. That official figures furnished the State Labor Department show that Mr. Axton (meaning plaintiff) pays an average wage considerably less than that paid by the American Tobacco Co. Official record: Here is what the official record of the State Department of Labor and Statistics shows about the Axton corporation's tobacco factory (meaning plaintiff's factory) compared with other factories: The tobacco trust pays many of its employes wages as high as $14.95 per week; the Burley Tobacco Company pays as high as $12 per week; while the highest wage the Axton factory (meaning plaintiff) pays to any of its employes is $8.75 per week.

" 'The sanitary conditions provided by the other factories are also shown by the records to be much better

than those furnished by the corporation (meaning this plaintiff) of which Mr. Axton is the head.

" 'Here are official figures: Axton Fisher Tobacco Factory, Thirteenth and Rowan: Number of hours per day, 10; number of hours per week, 59; highest wages, $8.75; average wage, $7.00.

" 'American Tobacco Company, Eighteenth and Broadway: Number of hours per week, 55; highest wage, $14.95; average wage, $7.50.

" 'Burley Tobacco Company, Jackson and Caldwell: Number of hours per week, 50 to 55; highest wage, $12.00; average wage, $8.00.

" 'Think of even the tobacco trust paying better wages and giving shorter hours and better sanitary conditions than the Axton corporation's factory (meaning plaintiff).

" 'In his (meaning plaintiff's) factory he (meaning plaintiff) puts negro foreman over white men. It is another example of his (meaning plaintiff's) double dealing with laboring men. He (meaning plaintiff) don't dare deny it.

" 'A negro named Brown was foreman on the third and fourth floors of Axton's factory (meaning plaintiff's factory) and that he had many white men under him. This is the same Wm. H. Brown, colored, whose name appears in the city directory, page 230, as foreman of the Axton Tobacco Factory.

" 'For three years prior to March, 1913, during the entire three years, a negro named Brown was foreman on the third and fourth floors of the Axton Fisher Tobacco Factory, and many white men worked under him at the factory.

" 'Among the number employed upon the third floor under Brown were a large number of white men.' " * * *

In paragraph 2, it was averred that in several editions of the paper printed, published and circulated on October 5, 1913, the defendants "wilfully, knowingly and maliciously published of and concerning the plaintiff and its business of manufacturing tobacco, and of and concerning the wages paid by it to its employes in its factory, the following false and defamatory statements:

" 'Axton's (meaning plaintiff's) average wage is lowest. Records of all factories. Official proof is given. Mr. Ben J. Sand, the State Labor Inspector, made a statement Monday morning.

" 'Mr. Sand states that the records of the State show that the charges made by Dr. Buschmeyer are entirely correct, and that Mr. Axton (meaning plaintiff) does not permit the eight hour rule in his (meaning plaintiff's) factory, and pays wages less even than those of the American Tobacco Co. There are in Louisville only four tobacco factories where smoking tobacco is manufactured. They are located as follows: American Tobacco Co., Eighteenth and Broadway, employing two hundred and sixty-three females; Burley Tobacco Co., employing thirty females in the manufacture of smoking tobacco; American Tobacco Co., Jackson and Finzer streets, employing one hundred and thirty-six females; Axton Fisher Tobacco Co., Thirteenth and Rowan streets, employing sixteen females. The Axton Fisher Tobacco Co. works fifty-nine hours a week, while the American Tobacco Co. works but fifty-five, with a Saturday half holiday throughout the year. The Axton Fisher Tobacco Co. does not give its employes a half holiday. The only other union tobacco factory, which is the Burley Tobacco Co., works its employes fifty and fifty-five hours each week and affords its employes a half holiday.

" 'The highest wages earned by any workers are: American Tobacco Co. (West End), high, $14.95; low, $4.00; average, $7.50. Burley Tobacco Co., high, $12.00; low, $7.00; average, $8.00. Axton Fisher Co. (meaning plaintiff), high, $8.75; low, $6.00; average, $7.00.

" 'In addition to the one hundred and fourteen day workers at the East End branch of the American Tobacco Co., there are twenty-two females employed under the piece system. High wages paid in this instance is $12.35, and the low wage is $7.00. The average is $7.50.

" 'The average weekly wage for a female in the employ of the Axton Fisher Tobacco Co. is $7.00. The average weekly wage for males and females employed by the company is $9.14.' "

In paragraph 3 it was averred that in several editions of the paper printed, published and circulated by the defendants on October 16, 1913, "they wilfully, knowingly and maliciously published of and concerning the plaintiff and its business of manufacturing tobacco, and of and concerning the wages paid by it to its employes in its factory, the following false and defamatory statements:

" 'Women workers paid scant wage by Axton (meaning plaintiff). Average of $5.40 a week for ten hours a day revealed by the records.

" 'The printed report of former Labor Inspector Filburn showing that the official records show that the average wage for women operatives in his (meaning plaintiff's) factory was only $5.40 a week.

" 'Now Mr. Axton (meaning plaintiff) has a legal right to work his (meaning plaintiff's) employes as long or as short as he (meaning plaintiff) wants to and to pay them as little or as much as he (meaning plaintiff) wants to. But he (meaning plaintiff) has no right while he (meaning plaintiff) is paying wages far below those paid by other factories, and working men and women long hours, to claim that he (meaning plaintiff) is a friend of labor.

" 'Get a copy of Mr. Filburn's report of 1910, when he was labor inspector, and turn to page 75 of that report and read what the official figures show were the conditions in Mr. Axton's (meaning plaintiff's) factory. Those official figures—they are all down on page 75—show that the average wage paid by Mr. Axton (meaning plaintiff) to his female employes was 90 cents a day for ten hours work. Think of it. A total of $5.40 a week, or 9 cents an hour. And remember that this was an average wage. It does not mean that $5.40 a week was the lowest wage Mr. Axton (meaning plaintiff) paid. It means that some got below $5.40 a week and that his (meaning plaintiff's) average wage for these workers was $5.40 a week.

" 'Get a copy of Labor Inspector Filburn's report of 1910 and turn to page 75. If what I tell you is not a public record and if it had not been true it would have been denied long ago.' "

In paragraph 4 it was averred that in several editions of the paper printed, published and circulated by the defendants on October 18, 1913, "they wilfully, knowingly and maliciously published of and concerning the plaintiff and its business of manufacturing tobacco; of and concerning the character and kind of foreman or boss it had placed over its girl employes in its factory, in Louisville; and of and concerning the wages paid by it to its employes in its said factory, the following false and defamatory statements:

" 'Negro foreman was placed as boss over white girls in Axton (meaning plaintiff's) factory. The negro fore-

man Will Brown was then placed in charge of machines where the girls were employed and as a boss over them. The girls then quit work and refused to work under a negro foreman. They reported the whole trouble to local Union No. 16.

" 'The union appointed a committee to look into the matter and report as to the merits of the grievance of the girls.

" 'This same Charles T. Hardy, tobacco worker, employed at Strater Bros. Tobacco Factory, was made chairman of the grievance committee.

" 'Mr. Hardy and the grievance committee investigated and found that the charges of the girls against Mr. Axton's factory (meaning plaintiff's factory) were true and so reported back to the union. Axton (meaning plaintiff) would not remedy the matter, and upon Mr. Hardy's recommendation the union, after a number of fruitless conferences with Mr. Axton (meaning with Mr. Axton as the president of plaintiff), withdrew the use of the union label from the Axton factory (meaning plaintiff's factory) and placed him and his factory (meaning plaintiff's factory) upon the unfair list. This action was ratified by the International Union of Tobacco Workers.

" 'The wages of the Axton factory (meaning plaintiff's factory) have never been raised to the basis of other factories in the same line of business, and are now only barely enough to keep the factory from being again placed upon the "unfair list." ' "

In paragraph 5, it was averred that in several editions of the paper printed, published and circulated by the defendants on October 23, 1913, "they wilfully, knowingly and maliciously published of and concerning the plaintiff and its business of manufacturing tobacco, and of and concerning its advertising cards and where they were printed, and of and concerning its relation to and attitude and feeling towards organized labor, the following false and defamatory statements:

" 'Axton's (meaning the plaintiff's) advertising cards printed in scab shops,' and 'Axton (meaning the plaintiff) displays his (meaning the plaintiff) contempt for organized labor,' comprising the opening and closing lines of said false and defamatory publication, to be printed in said newspaper in a most prominent and conspicuous manner and in letters three-quarters of an inch high and heavily underscored."

In paragraph six it was averred that in several editions of the paper printed, published and circulated by the defendants on October 27, 1913, "they wilfully, knowingly and maliciously published of and concerning the plaintiff and its business of manufacturing tobacco, the following false and defamatory statements:

" 'More proof of conditions in Axton (meaning plaintiff's) factory. Proof that white men had been required to work under a negro foreman at Mr. Axton's (meaning plaintiff's) factory.

" 'First as to Mr. Axton's (meaning plaintiff's) negro foreman, Will Brown: This negro was the floor boss over white men and girls. It is proved by Brown's own written statement as well as the affidavits of reputable witnesses.

" 'She was one of the girls who went on a strike some years ago when this negro Brown was made a boss over the white girls.' "

Summarizing this lengthy pleading, it will be noticed that in the matter set out by way of inducement it is averred that the tobacco company was engaged in the manufacture and sale of union made smoking and chewing tobacco and especially the brands known as "Old Hill Side" and "Booster Twist," and that it had built up and acquired a good reputation with the trade, the public generally and especially labor organizations and laboring people as a manufacturer of tobacco, and had acquired an extensive and lucrative demand for its products.

That it had for many years conducted and operated its business and factory as a unionized factory pursuant to a contract between it and the Tobacco Workers' International Union, by the terms of which contract it was authorized to place on all of its products the union label, which was a guarantee to organized labor that the tobacco on which it was placed was manufactured in a factory employing only union labor. And by virtue of the terms of the contract between it and the Tobacco Workers' Union it agreed to and did pay to its employes a scale of wages agreed upon between it and the union and in many instances largely in excess thereof.

That by its course of fair dealing with the trade, its employes, the public generally, organized labor and wage earners, it had acquired the good will of the public generally; and its sale to organized labor and wage earners constituted the largest part of its sale of tobacco. That the good will of union labor and wage earners towards

it and its right to place on its products the union label, constituted valuable assets in its business, and if it failed to comply with the terms of the contract between it and the tobacco workers' union, such failure would operate to deprive it of the union label and result in the union placing its factory on the unfair list, thereby depriving it of the patronage of union labor.

The false and defamatory publications complained of, it is averred by way of innuendo, were maliciously intended to injure and destroy its business, its good reputation and its good will with the public and especially with organized labor; to destroy the demand for its products with the public generally and especially with organized labor and wage earners, and to render it contemptible and odious to them as a manufacturer of tobacco, thereby injuring the value of its business and brands.

The alleged defamatory matter may be divided into four classes. (1) That it employed a negro as foreman or boss over white girls, and the white girls were required in its factory to work under a negro foreman.

That on account of this the girls quit work and reported the trouble to a local labor union, which appointed a committee to look into the matter, and this committee found that the charge of the girls that they were required to work under a negro foreman was true, and the tobacco company failing to correct or remove this cause of complaint, the union withdrew the use of the union label from the factory and placed the factory on the unfair list, which action was ratified by the International Union of Tobacco Workers.

(2) That its advertising cards were printed in "scab shops" and its advertisements were placed in street cars without the union label, to show its contempt for organized labor.

(3) That it paid less wages to its employes and required them to work more hours per day and week than the American Tobacco Co. or the Burley Tobacco Co., its only rivals located in Louisville in the manufacture and sale of tobacco, and never raised its wages to the basis paid in these factories.

(4) That the sanitary conditions in the American Tobacco Co. and Burley Tobacco Co. factories and other factories were much better than those in its factory.

Each of these classes will be dealt with separately, but before applying the questions of law that we think con-

trolling in the disposition of the case it may be well to here state that no special damage was alleged; nor was it essential to a good cause of action that special damage should have been alleged if, as contended by counsel, the publications were libelous *per se,* as a matter that is libelous *per se* is actionable without averment of special damage. As said in Newell on Slander and Libel, page 181:

"When language is used concerning a person or his affairs which from its nature necessarily must, or presumably will as its natural and proximate consequence, occasion him pecuniary loss, its publication *prima facie* constitutes a cause of action and *prima facie* constitutes a wrong without any allegation or evidence of damage other than that which is implied or presumed from the fact of publication; and this is all that is meant by the terms. 'actionable *per se.*' Therefore the real practical test by which to determine whether special damage must be alleged and proven in order to make out a cause of action for defamation is whether the language is such as necessarily must or naturally and presumably will occasion pecuniary damage to the person of whom it is spoken."

In such a case the complainant may rely upon the inference of damage raised by the law, and is not required to plead or prove that the publication has injured him. But when the publication is not so obviously defamatory that the inference of injury may be drawn, it can only be made actionable when the complaining party pleads and proves that it has, as a matter of fact, damaged him.

It might also be here further noticed that frequent references in the publication are made to "Axton" and to "Axton's corporation," but the fair and reasonable inference from the context of the published matter is that all references to "Axton" and to the "Axton corporation" were intended to and did apply to the Axton Fisher Tobacco Co. And when a publication, reading the whole of it, is plainly directed at a person or corporation, as the case may be, the person or corporation intended to be and that is in fact assailed by the publication may maintain an action for libel as freely as if he or it were particularly named or described in the publication, although neither the name of the person nor the style of the corporation has been accurately designated or described in the publication. And so we may treat these publications as referring to the Axton Fisher Tobacco Co.

Another elementary rule in the law of libel and slander is the difference between the actionable nature of alleged slanderous words and the actionable nature of alleged libelous words. In Riley v. Lee, 88 Ky., 603, in speaking of the general rule as to what publications may be treated as libelous, it was said:

"So it may be regarded as thoroughly settled, that if the written, or printed publication tends to degrade the person about whom it is written or printed—that is, if it tends to reduce his character or reputation in the estimation of his friends or acquaintances or the public, from a higher to a lower grade, or if it tends to disgrace him—that is, if it tends to deprive him of the favor and esteem of his friends or acquaintances or the public, or tends to render him odious, ridiculous or contemptible in the estimation of his friends or acquaintances or the public, it is, *per se,* actionable libel."

In slander the rule as stated in Williams v. Riddle, 145 Ky., 459, is that in the following cases only would words be slanderous or actionable *per se*: "(1) Words falsely spoken imputing the commission of a crime involving moral turpitude, for which the party might be indicted and punished: (2) Words imputing an infectious disease, likely to exclude him from society: (3) Words imputing unfitness to perform the duties of an office or employment: (4) Words prejudicing him in his profession or trade: (5) Words tending to disinherit him. In all other cases spoken words are either not actionable at all, or only actionable on proof of special damage."

It will thus be seen that many words are actionable when written or printed and published which would not be actionable if merely spoken. And so, in determining whether words are libelous *per se* or not, it is unnecessary to consider whether they impute to the person concerning whom they are published the commission of a crime involving moral turpitude, or an infectious disease, or unfitness to perform the duties of an office or employment, or prejudice him in his profession or trade, or tend to disinherit him. It is only essential to inquire whether or not they have a natural and reasonable tendency to degrade and disgrace the person of whom they are written, or to render him odious, ridiculous or contemptible. If they do, they are libelous *per se,* although they might not naturally or reasonably have any meaning that would make them actionable *per se* if spoken.

This distinction between libel and slander obtains as fully with respect to corporations as it does to individuals. And as a corporation like an individual may have a good reputation and enjoy the good will of its customers and the public, and this good reputation and good will are as valuable to it as good will would be to an individual or partnership, a corporation may maintain an action for slander or libel. But it can only do so when the effect of the words or publication complained of is to injure it in a business way, because it is only in respect to its business that a corporation in its corporate capacity can be affected or injured.

Therefore when the action is for an injury to a trade or business, there seems to us no room for a distinction in respect to what is libelous as between corporations, traders and merchants. If a publication would be libelous if it concerned a merchant or trader in his business, so would it be libelous if it concerned a corporation in its business. In either case it is an injury to the business that constitutes the gravamen of the offense, and in either case the effect is the same. What difference then can there be so far as the effect on business is concerned between the publication that brings the business of the trader or merchant into disrepute and that which brings the business of the corporation into disrepute? The corporation is as much concerned to have its business good will and reputation protected for the benefit and promotion of its trade as is a partnership or the merchant or trader.

And so when a corporation, such as the Axton Fisher Tobacco Co., charges that a publication respecting it is libelous *per se,* it is essential that it should reasonably and naturally appear from the publication complained of that it was of such a nature as to deprive it of the patronage or trade it enjoyed in a business way, or to render it so odious and contemptible in the estimation of those with whom it did have or might reasonably expect to have business dealings or connections as to injuriously affect its business.

We do not agree with the learned judge of the lower court that "to constitute a libel *per se* of which a corporation may complain, the publication must (1) misrepresent the character or condition of its marketable products, or, (2) misrepresent the methods by which its internal affairs are conducted, its capacity, or its business deal-

ings toward the public in such a way as to alienate customers, or (3) misrepresent it, its products, its attitude, its business, or its stability, so as to affect its credit.''

We think these limitations on what would constitute a libel *per se* are rather too narrow, as a publication respecting a corporation might injure very seriously its business and do it greàt damage in a business way without misrepresenting the quality of its marketable products, or the methods by which its business was conducted, or its attitude in its business dealings towards the public. If the publication is of such a nature as to reasonably and naturally render the corporation odious and contemptible in the estimation of the public or its patrons, and thereby deprive it of the favor and esteem of the public and the patronage and trade of its customers, its business may be as grievously injured and as seriously affected in a pecuniary way as if it were directly charged with misrepresenting the quality of its products or the method by which its business was conducted. And so if the publication reasonably and naturally has the effect of bringing the business of the corporation into public contempt, and of making it odious in the estimation of those with whom it has business dealings or connections, then the law will presume that the publication was actionable *per se* without either pleading or proof of special damage. It will be inferred that the publication did injure it in a business way, for it is only in a business way, resulting in pecuniary loss, that a corporation can be damaged by an alleged libelous publication: Newell on Slander and Libel, 3rd ed., p. 84; Townshend on Slander and Libel, 3rd ed., p. 279, 25 Cyc., p. 337; 18 A. & E. Ency. of L., 2nd ed., p. 954; note to Brayton v. Cleveland Special Police Co., 52 L. R. A., 525; Marino v. Di Marco, 41 App. D. C., 76, 48 L. R. A. (N. S.), 1214; Gross Coal Co. v. Rose, 126 Wis., 24, 2 L. R. A. (N. S.), 741; St. James Military Academy v. Gaiser, 125 Mo., 517, 46 Am. St. Rep., 502; Penn. Iron Works Co. v. Voght Machine Co., 139 Ky., 497.

It will, therefore, be seen that in testing the sufficiency of the publications on demurrer, the question to be determined is, can it be said as a matter of law that the publications were not of such a nature as to reasonably and naturally injure the corporation in a business way?

Having in mind these general principles, we come now to consider with more particularity the publications com-

plained of, with a view of deciding whether they were of such a nature as to reasonably and naturally tend to make the Axton Fisher Tobacco Co. odious or contemptible in a business way, thereby depriving it of the good will and patronage of its customers and the public generally, which deprivation of the good will and patronage of the public generally injured it in its property rights and caused it to suffer pecuniary loss. If the publications did have this tendency, then the petition, as a matter of law, stated a good cause of action.

The publications charging that the Axton Fisher Tobacco Co. paid an average wage less than that paid by the American Tobacco Co. and the Burley Tobacco Co., and required its employes to work a greater number of hours per day than either of these companies, and that the sanitary conditions of the American Tobacco Co. and the Burley Tobacco Co. were better than those of the Axton Fisher Tobacco Co., may be treated as publications of a like nature and disposed of together. These publications we do not consider libelous *per se.* The publication relating to wages did not charge that the wages paid by the Axton Fisher Co. were grossly or at all inadequate. It merely made a comparison of the wage scale of the other tobacco companies with its wage scale, and charged that it paid less than its competitors.

A publication charging that a business concern paid less wages than its rival or required its employes to work more hours per day or per week than its rival is nothing more than a comparison of conditions, and is not of such a nature as to reasonably or naturally make the employer odious or contemptible, and injure him in a business way. Employers of labor have the right unless regulated by contract or statute to pay their employes what they please and fix the hours of labor as they choose; and employes have the right to accept such wages as are offered them and to work such hours as the employment demands. There are doubtless many employers of labor who pay their employes less wages and require them to work more hours per day than other employers of like labor, and yet this might be entirely satisfactory to the employes. There are so many different conditions and so great a variety of circumstances surrounding the employment of labor in establishments carrying on the same lines of business that it would be going far beyond the reason of the thing to hold libelous *per se* a publication merely because

it charged that the complaining employer had a different wage scale or different hours of labor from his competitor.

And so with respect to the publication concerning the sanitary conditions. The publication did not charge that the conditions in the other factories were bad, or that those in the Axton Fisher Company's establishment were worse. It merely said that the sanitary conditions in the other factories were better than those prevailing in the Axton Fisher Company's factory; and the fact that they might have been better did not necessarily or at all convey the meaning that the sanitary conditions in the Axton Fisher Company's factory were hurtful or injurious to its employes, or that the sanitary conditions in its factory were such as to make it dangerous or unhealthful to use its products.

In short, the publication in respect to these matters would not, we think, naturally and reasonably have a tendency to affect the business standing of the Axton Fisher Co. or to render it so odious or contemptible in the estimation of the public or its customers as to injure its business or cause it to suffer pecuniary loss.

So much of the publications, however, in paragraphs 4 and 6 as charged that "a negro foreman was placed as boss over white girls. * * * The girls then quit work and refused to work under a negro foreman. They reported the whole trouble to the union and the union appointed a committee to look into the matter and report as to the merits of the grievance, * * * and found that the charges of the girls were true; and the company would not remedy the matter and the union withdrew the use of the label and placed the factory upon the unfair list, and this action was ratified by the International Union of Tobacco Workers; this negro was the floor boss over white girls. * * * She was one of the girls who went on a strike some years ago when this negro Brown was made a boss over the white girls," was, in our opinion, libelous *per se*.

It is very true that in Williams v. Riddle, 145 Ky., 459, this court held that it was not slander *per se* to say of and concerning a white man that he "was a damn negro and his mother was a mulatto." But in that case the court was very careful to say that there is a marked distinction between slander and libel and that many things are actionable when written and published which would not be

actionable if merely spoken, and the opinion was confined to the conclusion that these words did not constitute slander *per se*. There is no intimation in the opinion that if these words had been written or printed and published of and concerning Williams, they would not have been libelous *per se*. On the contrary we have no doubt that it would be libelous *per se* to write or print and publish of a white man that "he was a negro and his mother a mulatto."

It would hardly be possible to publish of a white person matter that would more certainly tend to degrade or disgrace him or to render him odious and contemptible in the estimation of his friends and acquaintances than to charge him with being a negro and that his mother was a mulatto. Perhaps there are some parts of the United States in which a publication of this nature would not tend to disgrace or degrade the white man of whom it was published, or render him odious and contemptible in the estimation of his friends and acquaintances. But in this State we are sure there could not be two opinions on this subject. It is not worth while here to undertake to set out the reasons why this is so. Sufficient is it to say that from inheritance, tradition, training, education and custom the difference recognized by all to exist between the white race and the negro race is so pronounced as that no greater disgrace could be put upon a white man than to publish a charge like this concerning him.

In Chiles v. C. & O. Ry. Co., 125 Ky., 299, where legislation requiring common carriers to have separate coaches for the colored race was upheld, in speaking of the distinction between the two races, the court said: "It had its origin in the creation of the races, and is firmly established as a part of the social and domestic order and economy of the country, and the man or set of men of either race who attempts to ignore or obliterate these distinctions and differences undertakes an impossible task. This racial distinction, and the resulting classification, is recognized by legislatures, authorized by courts, sanctioned by custom, and approved by an enlightened public opinion. It is not confined to any community, state or nation, but is found wherever the two races abound in sufficient numbers to make noticeable the impassable chasm that separates them. In the home, school, the church, the public place—in truth, everywhere—it exists."

In Berea College v. Com., 123 Ky., 209, where legislation prohibiting white and colored persons from being taught in the same school was upheld, the court said: "The separation of the white and black races upon the surface of the globe is a fact equally apparent. Why this is so it is not necessary to speculate; but the fact of a distribution of men by race and color is as visible in the providential arrangement of the earth as that of heat and cold. The natural separation of the races is therefore an undeniable fact, and all social organizations which lead to their amalgamation are repugnant to the law of nature."

In Harris v. City of Louisville, 165 Ky., 559, where a city ordinance making it unlawful for colored persons to establish or maintain a residence on certain streets occupied as residence streets by white people was sustained, the court said: "It needs no extended argument at this time to demonstrate that this State is fully committed to the principle of the separation of the races whenever and wherever practicable and expedient for the public welfare."

The legislation before the court in these cases merely gave statutory expression to a firmly established and deep-seated public opinion that demanded practical and enforcible recognition.

It is also beyond dispute that the sentiment reflected in this legislation and in these opinions does not find the end or the perfection of its purpose in mere race separation alone. It goes much further than that, as is shown in the general feeling everywhere prevailing that the negro, while respected and protected in his place, is not and cannot be a fit associate for white girls or the social equal of the white race. To conditions like these that are everywhere about them as a part of the social order and domestic economy of the State, courts can not shut their eyes. They must take notice of the long established and uniform custom and usage of the country in respect to the position of the races and the attitude of the white race toward the negro race.

And so we think the publication that a negro man was placed as a boss over white girls was surely calculated to arouse the hostility not only of organized labor and wage earners, but of all right-thinking people, to such an extent as to influence numbers of them to withdraw their patronage from a concern publicly and widely

charged with employing business methods so offensive to the sentiment and good judgment of all classes of decent white people.

That this conduct was calculated to create hostility toward the tobacco company and to injure it in a business way, is, we think, further shown by the fact stated in the publication, that the labor unions, as a result of the charge, placed this factory on the "unfair list."

The other publications relate to the charge in paragraph four, that the tobacco company, on account of its failure and refusal to remedy or remove the complaint lodged against it, that it employed a negro foreman as a boss over white girls, was placed on the "unfair list" by the local union; and this action was ratified by the International Union of Tobacco Workers, and to the charge in paragraph five that the advertising cards of the tobacco company were printed in "scab" shops so as to display its contempt for organized labor.

Accompanying this last charge there is made a part of the petition a page of the Evening Post showing that this matter was printed in large, black type, calculated to attract attention, and with it a picture of the sack containing "Old Hill Side" tobacco, with the comment that "The Axton tobacco brands are being advertised in street cars with display cards like the photographic facsimile here shown. Note the absence of the union label of either the International Typographical Union or the International Lithographers' Union."

In connection with the publication in reference to the "unfair list" and advertising in "scab" shops, it should be kept in mind that it was expressly averred as inducement that the tobacco company employed only union labor in the manufacture of its tobacco. That it had received from the union the right to place its label on its products, which was a very valuable asset in its business, and had obligated itself to patronize only unionized shops. That it had always dealt fairly and justly with its employes and had acquired and enjoyed a good reputation with and the good will of organized labor and wage earners in Kentucky and throughout the United States; and had especially acquired with them a valuable reputation and good will on its union made tobacco, and had built up and enjoyed an extensive sale of its tobacco to them, which constituted the larger part of the demand for its brands.

It should be further kept in mind that it was averred by way of innuendo that the effect of these publications was "to destroy its said good reputation and good will with organized labor and the public, as the operator of a union factory in the manufacture of tobacco; to destroy the demand for its products which it enjoyed from organized labor; to especially destroy the valuable reputation of 'Old Hill Side' as a union made smoking tobacco with organized labor and its sympathizers, and the demand therefor for them, and to incite the enmity and ill will of organized labor and its sympathizers towards plaintiff, its business and its products."

We may further take notice that union labor constitutes a large, influential and well organized body of the laboring people of this State and country, and that the wage earners, including those who are members of the union, compose a large part of our population. And also take notice, as a part of the history of the country, that labor unions have adopted and promulgated rules and regulations for the protection and guidance of labor, which are carefully observed by the members.

Coming now to consider the effect on the business of the tobacco company of the publications charging that it had been placed on the "unfair list" by union labor and that it had its advertising cards printed in "scab" shops, we may turn to the matter in the petition set out by way of inducement and to the matter set out by way of innuendo for the purpose of estimating and ascertaining the meaning and effect of the words "unfair list" when applied to a business establishment by organized labor, as well as the attitude of organized labor in a business way towards establishments that have been put by it on the "unfair list" or that have work done in "scab" shops.

Ordinarily to say that a business house had been put on the "unfair list" or that it had its printing done in "scab" shops, would convey but little meaning of the effect such a charge might have on the business of the concern so designated. In the usual and customary use of the words and according to their ordinary and natural meaning, it could hardly be said as a matter of law that a publication charging that a business establishment had been put on the "unfair list" or charging that it had its printing done in "scab" shops, would affect the business referred to in such a way as to cause it to suffer pecuniary loss thereby making the publication libelous *per se.*

It appears, however, from the publications themselves that these words have a special and significant meaning when applied by labor unions to business concerns that have been guilty of such conduct as to arouse the enmity of these organizations. But aside from and independent of this, we may look to the matter set out as inducement in the petition for the purpose of showing the relation, in a business way, between the tobacco company and union labor; and to the innuendo for the purpose of showing the defamatory meaning and application of the publications as manifested by their effect upon members of labor unions in business dealings with the tobacco company and the consequent business injury suffered by the tobacco company.

The authority for referring ᴏo the inducement as well as the innuendo for the purposes mentioned is found in well established rules in the law of libel and slander. Thus it is said in Newell on Slander and Libel, 3rd ed., pages 735 and 736, respecting the inducement: "In all cases where the alleged defamatory words, whether spoken, written or otherwise expressed, do not naturally in themselves convey the meaning the plaintiff would assign to them, or whether they are ambiguous or equivocal, and require explanations by reference to some outside or extrinsic matter to show that they are actionable, it must be expressly stated that such matter existed, and that the defamation related thereto. *  *  *  Where the matter complained of in the declaration as a libel does not upon its face apply to the plaintiff and impute a libel, the pleading must state, by way of inducement, such facts as will support such a meaning and show the libelous application of the matter to the plaintiff."

And in Townshend on Slander and Libel, 3rd ed., page 554, it is said: "It is the office of the inducement to narrate the extrinsic circumstances which, coupled with the language published, affect its construction and render it actionable; where standing alone and not thus explained, the language would appear either not to concern the plaintiff, or if concerning him, not to affect him injuriously. This being the office of the inducement, it follows that if the language published does not naturally and *per se* refer to the plaintiff, nor convey the meaning the plaintiff contends for, or if it is ambiguous or equivocal, and requires explanation by some extrinsic matter to show its relation to the plaintiff, and make it actionable,

the complaint must allege, by way of inducement, the existence of such extrinsic matter.''

It is also laid down in Townshend, page 586, that ''Where the language is ambiguous, and is as susceptible of a harmless as of an injurious meaning, it is the function of an innuendo to point out *the meaning* which the plaintiff claims to be the true meaning, and the meaning upon which he relies to sustain his action. This applies whether the ambiguity be patent or latent, and whether or not there are any facts alleged as inducement.''

And also laid down in Newell, page 754, that ''Where a defamatory meaning is apparent on the face of the libel itself, no innuendo is necessary; though even there the pleader occasionally inserts one to heighten the effect of the words. But where the words *prima facie* are not actionable, an innuendo is essential to the action. It is necessary to bring out the latent injurious meaning of the defendant's words; and such innuendo must distinctly aver that the words bear a specific actionable meaning.''

We find therefore that although these words standing alone would not be libelous *per se,* they are made so by the inducement and the innuendo, both of which must be read and considered in connection with the words, not for the purpose of enlarging their meaning but to show that under the circumstances they had a special meaning that was hurtful to the business of the tobacco company.

We also think that if words are published of a business concern that have a direct tendency to alienate from it the good will and patronage of a large class of its customers, although others of its patrons may not take offense at them or withdraw their patronage, an action will lie and the words will be treated as libelous, *per se*: Adolf Philipp Co. v. New Yorker Staats-Zeitung, 150 N. Y. Sup., 1044.

Wherefore, upon the whole case, we think the demurrer to so much of the publications as charged that the tobacco company employed a negro boss over white girls, and had been put on the ''unfair list'' by labor unions, and as charged that its advertising matter had been printed in ''scab'' shops, should be overruled.

The judgment is reversed, with directions to proceed in conformity with this opinion; the whole court sitting.