[Civ. No. 3332. Second Appellate District, Division Two.—May 21, 1920.]

ALEXANDER C. PYPER, Petitioner, v. LACY D. JENNINGS, Justice of the Peace, etc., Respondent.

[1] EVIDENCE—COMPELLING PRODUCTION OF PRIVATE BOOKS OR PAPERS —CONDITIONS PRECEDENT TO ORDER.—As a condition precedent to the right of a court to require a person to deliver up a private book or paper for examination, it must be made to appear, by clear and unequivocal proof, that the book or document contains evidence relevant and material to the issues before the court and that the precise book, paper, or document containing such evidence has been so designated or described that it may be identified.

[2] LIBEL—TRUTH AS DEFENSE—INNUENDO.—Where the defendant in a libel case sets up the truth as a defense, he must justify the

---

2. Truth as a defense to a civil action for libel or slander, notes, 17 Ann. Cas. 761; Ann. Cas. 1918C, 335, 1088; 21 L. R. A. 502; 31 L. R. A. (N. S.) 132; 50 L. R. A. (N. S.) 1040.

words in the sense in which the *innuendo* explains them, assuming, of course, that the words are capable of the meaning imputed to them by the *innuendo*.

[3] ID.—PLEA OF JUSTIFICATION—SCOPE.—The general rule is that the plea of justification in a libel case must be as broad as the charge, and, in point of law, must be identical with it.

[4] ID.—REPUTATION—HOW PROVED.—Reputation, or, as it is sometimes called, character, is a fact to be proved by the testimony of witnesses who know it, not by the proof of specific instances of misconduct which may or may not have affected it injuriously.

[5] ID.—STATEMENTS CONCERNING RE-ELECTION OF MAYOR—CONFIDENCE OF ELECTORS—UNJUSTIFIED INNUENDO.—A publication concerning the mayor of a city, "They were surprised you ever put him in office, dumbfounded at his re-election, and amazed beyond measure that you continue to put up with him," the word "they" referring to certain northern neighbors and the word "him" to the mayor, does not justify an *innuendo* to the effect that he was not worthy of the confidence of the electors.

[6] ID.—CHARGE OF BAD REPUTATION IN GIVEN LOCALITY—HOW JUSTIFIED.—A publication concerning the mayor of the city of San Diego that he might go to Tia Juana (Mexico) and get one hundred men to stand by him, the intention of the article being to convey the implication that his reputation among the habitués of the latter place is such that they believe he is not a citizen of good morals or integrity, or of good character, and is not acting in good faith in his declared purpose to suppress crime, and that because they so believed, they will be willing to stand behind him and be guided by him, can be justified only by proof that such is his reputation there and not by proof of specific acts of misconduct.

[7] ID.—ABSENCE OF CHARGE OF SPECIFIC ACT OF DISHONESTY—VAGUE REFERENCE TO OPINION OF OTHERS—PROOF IN JUSTIFICATION.—Where the libelous article, without imputing any specific act of dishonesty, seeks to blacken the good name of the object of the defamatory words by vague reference to some ill-defined opprobrious opinion others have of him, without conveying to the readers any sharply edged delineation of that opinion, the defendant can only justify by direct proof of bad, or, at least, impaired, reputation in the community or among the class of persons referred to in the defamatory article.

[8] ID.—STATEMENT THAT PERSON WORTHY OF CONFIDENCE—UNJUSTIFIED INNUENDO THAT OTHERS NOT WORTHY.—A published statement that "he [the chief of police] surely deserves credit for having control of that ungovernable temper (which is more than we can say of some folks), and must be worthy the confidence in him which I find expressed on all sides," does not justify an *innuendo* that the mayor of the city is not worthy of that confidence.

[9] ID.—INNUENDO EXPLAINING PUBLICATION — RIGHT TO JUSTIFY IN THAT SENSE.—The defendant in a libel action may justify the substance of the publication in the sense in which the *innuendo* explains it, if it explains it fairly, but the import of the words used in the publication cannot be enlarged, extended, or changed by the *innuendo,* and if it is, the *innuendo,* to the extent that it is not borne out by the defamatory words, will be rejected as surplusage.

[10] CONTEMPT — REFUSAL TO PRODUCE BOOK OR PAPER — ORDER PUNISHING—NECESSARY RECITALS.—An order punishing a witness for contempt for refusing, in open court, to produce a book or other document must recite the facts that constitute the contempt and confer jurisdiction upon the court to make the order, and for this purpose must recite facts showing that the document contains evidence pertinent and material to the issue to be tried.

[11] LIBEL—CHARGE OF GAMBLING—PROOF OF MISUSE OF TRUST FUNDS IRRELEVANT.—Where the defamatory words charge one with the gambling habit, the truth of the charge cannot be proved by evidence that the libeled person has misused trust funds.

APPLICATION for a Writ of Prohibition to restrain a justice of the peace from enforcing a judgment of contempt. Writ issued.

The facts are stated in the opinion of the court.

Morganstern & Dorn for Petitioner.

Curtis Hillyer and Wright & McKee for Respondent.

FINLAYSON, P. J.—This is an application for a writ of prohibition to restrain respondent, justice of the peace for the township of San Diego, from enforcing a judgment of contempt rendered by him in an action for criminal libel then pending in his court and entitled "The People of the State of California, Plaintiff, *v.* The San Diego Sun Publishing Company, a Corporation, and R. A. Lacy, Defendants."

The criminal action, in the course of which the contempt proceedings arose, is based upon a defamatory article alleged to have been published of and concerning Louis J. Wilde, mayor of the city of San Diego. The defendants in the criminal action undertook to prove the truth of the libelous charge. For that purpose they sought to cause to be produced in court certain books in the possession of the petitioner here. These books, so it is claimed, show the pay-

ments into and disbursements from a certain trust fund, under the control of Wilde, known as the Community Oil Well Fund. As a basis for their claim that the books contain evidence relevant and material to the issues presented by the complaint in the action for criminal libel, the defendants in that action contended, as does the respondent here, that the entries in the books show that Mayor Wilde was not a man of integrity, in this, that they disclose that he had applied some of the moneys in the Community Oil Well Fund to uses foreign to the purposes for which that trust fund had been created. The fund is one in which private persons only are interested.

While a witness in the justice's court, petitioner was ordered by respondent to produce the books. Upon his refusal to comply with that order petitioner was adjudged guilty of contempt of court and sentenced to imprisonment in the city jail for one day.

Respondent has demurred to the petition, and, at the same time, has filed a written answer. It was stipulated at the hearing that, in so far as the averments of the answer are allegations of fact and not mere conclusions of law, its averments are true. We, therefore, deem it not only the more expeditious course, but proper, to dispose of the case on its merits, and for that purpose, to consider the case in its entirety—the facts averred in the answer as well as those alleged in the petition for the writ.

[1] It is the established rule that, as a condition precedent to the right of a court to require a person to deliver up a private book or paper for examination, it must be made to appear, by clear and unequivocal proof, (1) that the book or document contains evidence relevant and material to the issues before the court; and (2) that the precise book, paper, or document, containing such evidence has been so designated or described that it may be identified. (*Ex parte Clarke*, 126 Cal. 235, [77 Am. St. Rep. 176, 46 L. R. A. 835, 58 Pac. 546]; *Kullman etc. Co. v. Superior Court*, 15 Cal. App. 276, [114 Pac. 589]; *Funkenstein v. Superior Court*, 23 Cal. App. 663, [139 Pac. 101].) For the purpose of this decision we shall assume that, by evidence properly adduced in the justice's court during the trial of the criminal action, the books themselves, and so much of their contents as the defendants in that action sought to introduce

in furtherance of their declared purpose to show that Wilde
had improperly used certain moneys of the Community Oil
Well Fund, were identified with all the particularity re-
quired ' for compliance with the constitutional guaranty
against unreasonable searches and seizures. Under the rule
just adverted to, however, there was this further requisite:
It was essential, as a condition precedent to the right of the
justice's court to require petitioner to deliver the books up
for examination, that it be made to appear, by clear and
unequivocal proof, that the books contain evidence relevant
and material to the issues in the criminal action. In our
opinion the entries in the books, assuming that they do show
that, at times, Mayor Wilde misused or misapplied certain
of the moneys of the trust fund, are not material to any
issue in the criminal action. Conceding to the defendants
in that action all that they there claimed respecting the
nature of the book entries, the entries, nevertheless, would
not tend to prove the truth of any of the defamatory matters
in the alleged libelous article as charged in the criminal
complaint.

The alleged libelous article, published in "The San Diego
Sun," a newspaper printed and published in that city, is as
follows:

"Editor Sun: Having come from a northern city where
one of your city officials is only too well known, it was with
considerable amusement that I read an article by him in a
morning paper some few days ago. Hearing the public on
every · hand referring to same as another 'Brain Storm,'
proved San Diegans are 'next,'—but truly it is sad your
northern neighbors are not aware of this. They were sur-
prised you ever put him in office, dumfounded at his re-
election and amazed beyond measure that you continue to
put up with him. San Diego must be virtuous if patience is
anything to go by; but there comes a time when patience
ceases to be a virtue. According to his own statements in
the Sunday paper the 100 citizens didn't show up. Why
doesn't he got to Tia Juana. He ·might get 100 there to
stand by him, even though it is said there is honor among
thieves. The ungentlemanly remarks and foul language he
allows to come in print above his name must disgust even
the worst. Although hearing the best reports of the San
Diego police department, and personally knowing of some

very efficient work done by same, I can speak only in terms of the department. If, however, your police chief is anything like your mayor described him, he must be Wilde's twin brother, for he surely drew his own picture to perfection. What I can't understand is that the alleged ungovernable temper of your chief hasn't let loose and made a large and rather dirty grease spot in your city hall. He surely deserves credit for having control of that ungovernable temper (which is more than we can say of some folks), and must be worthy the confidence in him which I find expressed on all sides. I do feel, however, your mayor is to be pitied rather than censured, but it is a shame that your lovely city must be the goat and suffer such humiliations. You are laughed at, but what can you expect with your jazz cat gambles and brain storms? You have an exceptional council; get rid of your Wild mayor, and San Diego will take her place in the top ranks.

"Yours from the north,<br>"R. A. Lacy, Gen. Del."

While this defamatory article may have a tendency to expose Mayor Wilde to public ridicule, it will be noticed that nowhere does it make any direct charge of dishonesty—certainly none of the character sought to be proved by the books that petitioner refused to produce; though, of course, it is possible that some passages of the letter published in "The Sun" may have a covert meaning, which, read in the light of such extrinsic circumstances as formerly it was the office of the inducement to narrate, may be susceptible of a construction imputing to the mayor dishonesty in financial transactions. But unless, by way of *innuendo,* there is some averment in the criminal complaint that properly places such a construction upon the words of the defamatory article, the defendants in the criminal action cannot adduce evidence of any specific misappropriation of trust funds.

[2] The rule is that where the defendant in a libel case sets up the truth as a defense, he must justify the words in the sense in which the *innuendo* explains them, assuming, of course, that the words are capable of the meaning imputed to them by the *innuendo.* (*Snyder* v. *Tribune Co.,* 161 Iowa, 671, [143 N. W. 519]; note to *Hutchins* v. *Page,* 31 L. R. A. (N. S.) 140; 25 Cyc. 460; Newell on Slander, and Libel, p. 793.) In *Snyder* v. *Tribune Co., supra,* the

court said: "A proper plea of justification either expressly or impliedly admits the truth of the *innuendo* [for the purpose of the justification]; and, where the defendant sets up the truth, he must justify the words in the sense in which the *innuendo* explains them, unless the words used in the *innuendo* enlarge the natural and ordinary sense of the language, or otherwise place a false construction thereon."

The complaint in the action for criminal libel, after setting forth the libelous article *in haec verba,* proceeds, by the averment of what the pleader deemed to be appropriate *innuendoes,* to explain certain passages by alleging the meaning that the defendants intended to convey to readers thereof. It is claimed by respondent that these *innuendoes* give to the libelous article such a meaning that the defendants in that action, for the purpose of proving the truth of the libelous charges, may rightfully show any specific act of dishonesty on the part of Mayor Wilde, and that for that purpose, the books showing Wilde's disbursements from the Community Oil Well Fund were admissible in evidence.

Taking up now the particular *innuendoes* relied upon by respondent to justify his order adjudging petitioner guilty of contempt: By way of *innuendo,* the complaint in the criminal action alleges that "by and through the said letter above set forth the said defendants then and there intended to convey to any and all persons who read the same, by the use of the words 'where one of your city officials is only too well known,' that he, the said Louis J. Wilde, was, in the said northern city, unfavorably known, and was not entitled to the respect of those with whom he was acquainted in said northern city *because he, the said Louis J. Wilde, lacked integrity."* We have italicized the words of this *innuendo* upon which respondent particularly relies.

The words used in the alleged defamatory article "a northern city where one of your city officials is only too well known," at most can import no more than that, among the inhabitants, or some of them, of a city north of San Diego, Mayor Wilde bears an unsavory reputation. An odious reputation in some unidentified northern city is, therefore, the gist or sting of the libelous charge. The defamatory charge implies no particular act committed by Wilde. Nor does it impute a reputation for the commission of any particularly improper, immoral, or criminal act; but

only that, in the estimate of the public in some unnamed city, his reputation is bad—that his good name, credit, or honor, *as derived from public opinion* in that northern city, is to some extent impaired. [3] The general rule is that the plea of justification must be as broad as the charge, and, in point of law, must be identical with it. Here, in order to justify, by proof of the truth of the words "a northern city where one of your city officials is only too well known," it would be necessary to show that, in the northern city referred to by the author of the article, or which the readers understood to be the city referred to, Mayor Wilde's general reputation is not good. [4] Reputation, or, as it is sometimes called, character, is a fact to be proved by the testimony of witnesses who know it, not by the proof of specific instances of misconduct which may or may not have affected it injuriously. Every man is bound, and is supposed to be always prepared, to answer and repel imputations upon his general reputation whenever that reputation is by the rules of law assailable in court, but not to answer specific charges of misconduct where no specific charge is imputed by the defamatory article of which he complains. Particular instances of misconduct on the part of a plaintiff in a civil action for libel, or of the complaining witness in an action for criminal libel, have no necessary connection with his reputation. It may not be known or believed that such specific acts of misconduct have in fact occurred, and so their occurrence may have produced no effect upon the public mind, and, consequently, have nothing to do with the good or bad reputation of the person libeled. Here the defamatory article merely implies that San Diego's mayor has acquired, in some unnamed community a bad reputation, or, at least, that his general reputation in such community is, to some extent, impaired. But that is a matter that rests upon public opinion, and may exist without any just foundation. It is the existence of the public opinion, and not the foundation on which that opinion rests, that is the fact put in issue. There is, therefore, no necessary connection between any specific act of misappropriation of trust funds, such as may be disclosed by the entries in these private books of account, and a loss of Wilde's good reputation in some unidentified city where, it is charged, he "is only too well known." The case of *Swift* v. *Dickerman,* 31 Conn.

285, 293, is somewhat instructive in this connection. It was held in that case that where the libelous article reflects upon the general professional reputation of a physician, evidence of specific instances of mistakes in his treatment of his patients is not admissible. The general line of reasoning pursued by the Connecticut court in that case is applicable here. (See, also, *Cooper* v. *Greeley*, 1 Denio (N. Y.), 347, 365.) For these reasons we hold that the order directing petitioner to produce the books of the Community Oil Well Fund was not warranted by anything alleged in the *innuendo* that seeks to give point to the charge that Mayor Wilde "is only too well known" in the northern city referred to by the author of the defamatory article.

[5] It next is sought to justify the contempt order by this averment of the criminal complaint, alleged by way of *innuendo:* "By the use of the words, 'They were surprised you ever put him in office, dumfounded at his re-election, and amazed beyond measure that you continue to put up with him,' it was intended to convey to the persons who read said letter that said northern neighbors could not understand how the people of San Diego would re-elect said Louis J. Wilde to the office of mayor of the said city of San Diego, and that he, the said Louis J. Wilde, was not entitled to be re-elected, *nor was he worthy of the confidence of the electors of said city.*" It is the last clause of this averment, italicized by us, upon which respondent relies to justify his order adjudging petitioner guilty of contempt. But this *innuendo,* if respondent's interpretation of it be accepted as that intended by the pleader, is much too broad. As construed by respondent to justify his order to produce the books, this part of the *innuendo* gives to the language of the defamatory article a forced and unnatural meaning. The language of the alleged libelous article is: "They [your northern neighbors] were surprised you ever put him [Mayor Wilde] in office, dumfounded at his re-election and amazed beyond measure that you continue to put up with him." These words, read in the light of their context, can only mean that the "northern neighbors," whoever they may be, by reason of Mayor Wilde's reputation, *as they know it,* were surprised, dumfounded, and amazed. It may well be that, in the opinion of these northern neighbors, and solely because of the reputation that he bears

among them, Wilde was not entitled to be re-elected and is not now worthy of the confidence of the electors of San Diego. But this is not tantamount to a charge that Mayor Wilde, in fact, was not entitled to be re-elected, or that, in fact, he is not worthy of the confidence of his San Diego constituents. The gist or sting of the charge is that Mayor Wilde bears a poor reputation among the members of some northern community—that his reputation among them is so poor that they were surprised that the electors of San Diego put him in office, etc. So here again the *fact* put in issue is the state of the public mind in some unnamed northern city. The truth of the charge can only be shown by direct evidence of Mayor Wilde's general reputation for trustworthiness in the particular northern city that the author of the defamatory article had in mind when he wrote the letter to "The San Diego Sun." Such evidence can be given only by those who can testify that they know Wilde's reputation in the northern city referred to by the author of the article. To give to that part of the *innuendo* italicized by us—the part upon which respondent relies to justify his order—an interpretation consonant with the obvious meaning of the defamatory words sought to be explained thereby, it must be construed as meaning that San Diego's northern neighbors, because of what they believe Wilde to be, could not understand how or why he was entitled to be re-elected, or how or why he should be worthy the confidence of the electors of San Diego.

[6] It is alleged in the complaint in the criminal action, by way of *innuendo,* that, by the words "according to his own statements in the Sunday paper the 100 citizens didn't show up. Why doesn't he go to.Tia Juana? He might get 100 there to stand by him, even though it is said there is honor among thieves," the defendants in the criminal action intended to convey to readers of the article that Mayor Wilde had been unable to obtain one hundred citizens of San Diego to assist him in supressing crime in that city, and that, therefore, he should go to Tia Juana, Mexico, where he would find one hundred men who might be willing to assist him in an apparent effort to suppress crime in San Diego, but that they would not make any *bona fide* effort to suppress crime, because they are men of dissolute character and would be in sympathy with Mayor Wilde and

would be guided by him in anything he undertook, "because of the fact that he, the said Louis J. Wilde, was not a citizen of good morals or integrity, or good character, and was not acting in good faith in his declared purpose to suppress crime in San Diego." The sting of the libelous words, as explained by this *innuendo,* is that Mayor Wilde's reputation among the habitués of Tia Juana is such that they, or one hundred of them, would be willing to stand by him in a simulated effort to suppress crime, and would be guided by him in anything he undertook. It is what the one hundred denizens of Tia Juana think of Wilde, and not what he actually is, that will determine their attitude toward him and his official conduct. He may or may not be honest in fact. But whether he be in fact a man of integrity or the reverse, the one hundred dissolute characters of Tia Juana will be guided by him because, and only because, of what they believe him to be.

The publishers of the defamatory article, in almost every instance throughout their attack upon Wilde, have screened their assault behind either a direct or a veiled reference to Wilde's reputation among persons of a certain community or among those of a certain class. First, there is the reference to Wilde's reputation among the people of a northern city—San Diego's northern neighbors. Now, there is a reference to the dissolute characters of Tia Juana, and their attitude toward Wilde—based, necessarily, upon what they think of him. By the defamatory words which we at present are considering, the publishers of the article screen their attack with the veiled implication that Wilde's reputation among the habitués of Tia Juana is such that they believe that he is "not a citizen of good morals or integrity, or of good character, and is not acting in good faith in his declared purpose to suppress crime," and that because they so believe, they will be willing to stand behind him and be guided by him. This, manifestly, is the meaning intended. For obviously the one hundred frequenters of Tia Juana will be guided by what they believe Wilde to be, not what he may in fact be. Therefore, it is his reputation among the men of Tia Juana that Wilde must come prepared to defend, not his innocence of any and every specific charge of dishonesty that defendant may unexpectedly spring at the trial.

[7] We are not to be understood as holding that where

some specific act of wrongdoing is the sting of the charge, the defendant in a libel action cannot justify by proof of the truth of such specific act of misconduct, even though such wrongful act be covertly conveyed to the readers of the article as a lurking implication, concealed in some reference to the reputation of the person libeled. What we do hold is that where, as here, the libelous article, without imputing any specific act of dishonesty, seeks to blacken the good name of the object of the defamatory words by vague references to some ill-defined opprobrious opinion others have of him, without conveying to the readers any sharply edged delineation of that opinion, the defendant can only justify by direct proof of bad, or, at least, impaired, reputation in the community or among the class of persons referred to in the defamatory article.

[8] It is alleged in the criminal complaint that, by the use of the words "he [the chief of police] surely deserves credit for having control of that ungovernable temper (which is more than we can say of some folks), and must be worthy the confidence in him which I find expressed on all sides," it was intended to convey to readers of the article that the chief of police of San Diego had proper control of his temper and was worthy the confidence of the people of San Diego, but that Wilde "was not worthy of such confidence." This averment also is relied upon by respondent to justify his order directing petitioner to produce the books. But the *innuendo*, in so far as it undertakes to explain the libelous words by ascribing to them the meaning that Wilde is not worthy the confidence of the people of San Diego, is not supported by the libelous language that it seeks to explain. The *innuendo* improperly enlarges the plain and unambiguous meaning of the words of the article. The words of the defamatory article are: "He [the chief of police] . . . must be worthy the confidence in him which I find expressed on all sides." This language cannot be made to carry the covert charge that Mayor Wilde does not deserve the confidence of the people of San Diego. An *innuendo* seeking to give to the words of the published article any such meaning enlarges the natural and ordinary sense of the words. Without doubt, the ascription to one person of some particular virtue may be made in such a manner as to imply that another, at whom the blow

is indirectly aimed, is lacking in that virtue. But here the libelous article affords no basis for the claim that any such contrasting of the two men was intended. It is made sufficiently apparent from the context that praise of San Diego's chief of police cannot be regarded as an indirect reflection upon the mayor. At any rate, the praise of the former cannot be regarded as carrying the imputation that the latter has forfeited his title to confidence by reason of any act of dishonesty. [9] The defendant in a libel action may justify the substance of the publication in the sense in which the *innuendo* explains it, if it explains it fairly, but the import of the words used in the publication cannot be enlarged, extended or changed by the innuendo, and if it is, the *innuendo*, to the extent that it is not borne out by the defamatory words, will be rejected as surplusage. We think that that part of the *innuendo* that ascribes to the words of the libelous article the meaning that Wilde is not worthy the confidence of the people of San Diego places a false and unwarranted construction upon the words of the published article, and should be rejected as surplusage.

Finally, it is claimed by respondent that the entries in the books of the Community Oil Well Fund, showing, so it is claimed, the misuse of trust funds by Wilde, are relevant to the issues presented by these averments of the complaint in the criminal action: "By the use of the following words: 'I do feel, however, your mayor is to be pitied rather than censured, but it is a shame that your lovely city must be the goat and suffer such humiliations. You are laughed at, but what can you expect from your jazz eat gambles and brain storms?' it was intended to have the readers of said letter understand that he, the said Louis J. Wilde, was mentally irresponsible, and that by reason thereof he was to be pitied rather than censured, and that it was a shame that San Diego was made to suffer because of the fact that said Louis J. Wilde was the mayor of said city, and that he, the said Louis J. Wilde, was causing persons residing outside the city of San Diego, and therein, to laugh at San Diego, because he, the said Louis J. Wilde, was engaged in gambling, and that he was suffering from mental unsoundness." Here the stings of the publication are that Wilde is mentally unbalanced and that he has been engaged in gambling. We do not know whether the books of the Community Oil

Well Fund show that Mayor Wilde has been engaged in gambling. But if they do, that fact can afford no foundation for the order adjudging petitioner guilty of contempt. [10] The rule is that an order punishing a witness for contempt for refusing, in open court, to produce a book or other document must recite the facts that constitute the contempt and confer jurisdiction upon the court to make the order. For this purpose the order must recite facts showing that the document contains evidence pertinent and material to the issue to be tried. (*Overend* v. *Superior Court*, 131 Cal. 280, [63 Pac. 372].) [11] Here the order adjudging petitioner guilty of contempt, a copy of which is annexed to respondent's answer, contains no recital that the books of the Community Oil Well Fund show that Wilde has ever been engaged in gambling. The most that the order attempts to show is that the books disclose that Wilde has misused the moneys of a fund intrusted to him. A charge that Wilde "was engaged in gambling" is not a charge of dishonesty of the character involved in the misuse of trust funds. Without enlarging upon the iniquity of gambling, suffice it to say that, however much moral obliquity may inhere in that vice, its unethical features are not of the character that distinguishes such downright acts of dishonesty as the misappropriation of trust funds. Where a charge is made in general terms imputing to another a habit or custom of wrongdoing, it has been held that particular acts of misconduct *of the same character as the offense charged* are admissible in evidence as tending to prove the truth of the charge; but never has it been held that wrongful acts of an entirely dissimilar character may be given in evidence in proof of the charge. (17 R. C. L. 413.) It follows, therefore, that where the defamatory words charge one with the gambling habit, the truth of the charge cannot be proved by evidence that the libeled person has misused trust funds.

For the foregoing reasons we are of the opinion that Wilde's wrongful appropriation of the moneys of the Community Oil Well Fund, if, in fact, he did misappropriate them, was not relevant to any issue presented by the complaint in the criminal action, and that, therefore, the books that this petitioner was directed to produce contain no evidence pertinent or material to the issues before the justice's court.

Our conclusion is that respondent was without jurisdiction to make the order adjudging petitioner guilty of contempt of court, and that the order is, therefore, void.

Let the peremptory writ issue as prayed.

Thomas, J., and Weller, J., concurred.