[Civ. No. 10286. First Appellate District, Division One.—June 29, 1937.]

MAX JACKSON, Appellant, v. UNDERWRITERS' REPORT, INC. (a Corporation), et al., Respondents.

Edgar C. Levey for Appellant.

Thornton & Watt and Thornton, Menzies & Taylor for Respondents.

KNIGHT, J.—The plaintiff Max Jackson, alleging he was libeled by certain portions of a news article appearing in the "Underwriters' Report", a San Francisco weekly newspaper published by defendants in the interests of the insurance business, brought this action to recover compensatory and punitive damages. The cause came on for trial before a jury, and at the conclusion of plaintiff's case the trial court granted defendants' motion to strike out all evidence upon the ground that the complaint failed to state a cause of action and to grant a nonsuit. From the judgment entered in defendants' favor pursuant to the order so made plaintiff appeals.

Libel, as defined by section 45 of the Civil Code, is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure his reputation. By subdivisions 3 and 4 of section 47 of said code it is declared that a privileged communication is one made "3. In a communication, without malice, to a person interested therein, (1) by one who is also interested,

or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information.'' ''4. By a fair and true report, without malice, in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof . . . '' And section 48 of said code provides that malice is not inferred from communications or publications falling within the provisions of subdivisions 3, 4 and 5 of said section 47.

■ With respect to the question of the legal sufficiency of a complaint in a libel action, it appears to be well settled that where the existence of the privilege is disclosed on the face of the complaint (*Locke* v. *Mitchell et al.*, 7 Cal. (2d) 599 [61 Pac. (2d) 922] ; *Morcom* v. *San Francisco Shopping News,* 4 Cal. App. (2d) 284 [40 Pac. (2d) 940] ), the privilege is available as a defense on demurrer. (*Gosewisch* v. *Doran,* 161 Cal. 511 [119 Pac. 656, Ann. Cas. 1913D, 442].)

■ Furthermore, as pointed out in *Locke* v. *Mitchell et al., supra,* while in the case of a false and unprivileged publication, libelous *per se,* malice is implied and lack of it is a matter of defense, which need not be pleaded, this is not true of a qualified privilege arising under subdivisions 3, 4 and 5 of section 47, because, as expressly declared by section 48, malice is not inferred from publications falling within those subdivisions; and hence where a complaint discloses a case of qualified privilege, malice is not presumed, and in order to state a cause of action the pleading must contain affirmative allegations of malice in fact. (Citing cases.) And in this latter connection it has been definitely held that an allegation that the article complained of was ''maliciously published'' is legally insufficient for the reason that it is merely the conclusion of the pleader. (*Taylor* v. *Lewis,* 132 Cal. App. 381 [22 Pac. (2d) 569] ; *Locke* v. *Mitchell et al., supra.*)

■ In the present case, as defendants contend, it appears from those portions of the news article pleaded *in haec verba* in the complaint that the article from which they were extracted was the report in a public journal of a judicial proceeding and of what was said in the course thereof. It is not claimed that said article is libelous *per se,* nor is it alleged that the portions thereof upon which the action is founded do not constitute a fair, just report of such judicial

proceedings. Defendants contend therefore that in order to state a cause of action it was necessary, under the rule declared in *Taylor* v. *Lewis, supra,* to allege facts from which malice might be inferred; and this was not done. As in *Taylor* v. *Lewis, supra,* it was alleged merely that defendants ''maliciously wrote and published'' the same. Moreover, it is equally well settled that where, as here, punitive damages are sought, malice in fact must be alleged. (*Taylor* v. *Lewis, supra; Davis* v. *Hearst,* 160 Cal. 143 [116 Pac. 530].) It would seem, therefore, that under the legal rules above adverted to, there is much merit in defendants' contention that the complaint failed to state a cause of action.

■ Irrespective, however, of the question of the legal sufficiency of the complaint, it seems clear that in any event the evidence adduced on behalf of plaintiff, as a matter of law, failed to establish a case of libel; and that being so, the order granting the nonsuit must be sustained. As said in the following cases, when a motion for nonsuit has been granted, the judgment will be upheld if it can be justified on any ground, whether made a ground of the motion or not. (*Anchester* v. *Keck,* 214 Cal. 207 [4 Pac. (2d) 934]; *Inderbitzen* v. *Lane Hospital,* 124 Cal. App. 462 [12 Pac. (2d) 744, 13 Pac. (2d) 905].)

With reference to this second point, it appears that the alleged libelous matter consisted of the concluding portion of a rather lengthy news article headed: ''FIRE COS WIN FRAUD CASE. Court Upholds Carriers' Contention of Fraud Following Silk Mill Fire.'' The article then proceeded as follows: ''After almost a month's trial, the jury this week returned a verdict in favor of the companies in the case of *North British & Mercantile and the Springfield F. & M.* v. *Mercantile Silk Corporation, Ltd.,* growing out of the fire which damaged insured property of the latter at Los Angeles on May 27, 1933. Following the fire, which involved some $60,000 of fire insurance, the carriers denied liability on the grounds of attempted fraud and false swearing. The assured took the matter to court and Thornton & Watt, attorneys for the companies, set up defenses in the following six classifications:'' Among these were: that the insured had no title to the property; that the insurance was obtained and the subsequent transaction had for the purpose of cheating and defrauding; that the insurance was suspended because of increased fire hazard under the control

of the insured, more than one quart of gasoline being kept on the premises; failure of the insured to have an appraisal; fraud and false swearing on the part of the insured as to cost and ownership of the property and the amount of loss sustained by the fire; and that the insured did not protect the property from further damage. The article then went on to say that the insurance companies' attorneys in their review of the case found that the machinery (knitting machines) was purchased in July, 1929, by A. W. Hillman and Bernard Jakubovitz for $13,000; that Hillman had stated under oath that it cost between $40,000 and $50,000, and admitted that it had been damaged in transit to the coast; that a claim had been made against the railroad company for $12,000, which indicated that the machinery belonged to the Pacific Coast Rayon Company. Continuing, the article stated that there was no written transfer of the property until May, 1933, when Hillman transferred it to the Mercantile Silk Corporation; that in the meantime, in March, 1930, a fire occurred and proof of loss was filed for $62,000, which was settled by payment of $40,750 to the Pacific Coast Rayon Company; that according to the attorneys for said insurance carriers, Hillman was unable for about two years thereafter to obtain more than $5,000 insurance on the machinery and merchandise, whereupon in order to cheat and defraud the insurance companies a series of transfers of title was made through two "dummies" named Williams and Troutfelt to the Mercantile Silk Corporation; that the sales transaction was placed in escrow with a trust company; that notes were given in the sum of $45,000, and the trust company, as trustee, was named as the insured; that thereafter certain cancellations and replacements of insurance were made, and on May 27, 1933, the property burned; that cross-examination by the insurance carriers' attorneys revealed that Williams had never met Hillman or Troutfelt, that he had never seen the machinery, had no intention of buying it and never paid anything for it; that Troutfelt had paid no part of the $41,000 for the property, and had been persuaded by Hillman to act as a dummy in the transaction for the purpose of building up the value for a prospective purchaser. And the article concluded with the following matter, upon which plaintiff based his action for libel: "Evidence was also introduced to indicate that deliberate damage to machinery and stock had been done after the fire by use of water and clorox and that there was

practically no fire damage to the machines. Appraiser Had Fire Loss Also. On cross-examination of the appraiser appointed by the insured, it was revealed that he, the appraiser, whose name is Max Jackson, had had losses in which he had collected over $40,000 from insurance companies and that after one of his losses he left the country for a period of time. The jury was convinced that the whole transaction was fraudulent not only its inception but also in the fire and in the proceedings subsequent thereto. The jury was polled and it developed the verdict in favor of the insurance carriers was unanimous. It is also interesting to note that throughout the trial there were constant but unsuccessful attempts on the part of attorneys for the insured to introduce the book by H. M. Farrar, which proposes to reveal fire insurance adjustments as a 'racket'.''

 As will be noted, plaintiff was mentioned but once in the entire article; and it was shown by his own testimony given at the present trial that the published report of the testimony given by him on cross-examination at the trial of the Mercantile Silk Corporation's case was neither unfair nor untrue. In this regard he admitted having then testified that the companies operated by him had two fires, as the result of which he collected $40,000 insurance; that about seven months later, in October, 1929, he sailed for Australia, via Honolulu, under the name of ''Max Meyer'', and registered at a hotel in Honolulu under the name of ''Max Marks''; that from Honolulu he went to Australia, thence to Johannesburg, and thence to Buenos Aires, where he was taken ill and did not return to the United States until 1931. Moreover, plaintiff wholly failed to show malice on the part of defendants. On the contrary, he introduced testimony which completely negatived such element. In this respect the record shows that plaintiff called as a witness, subject to the provisions of section 2055 of the Code of Civil Procedure, the president and controlling head of the company publishing said newspaper; and as to the element of malice he testified that he was not familiar with the facts set forth in the article before it was published; that he did not know plaintiff, had never heard of him before, never had any dealings with him, did not remember ever having seen him before, and that he had no feeling of any kind, for or against him. And no attempt was made by plaintiff to contradict or impeach the testimony so given.

Thus it affirmatively appeared without conflict from the evidence given in support of plaintiff's case that the article alleged to be libelous was qualifiedly privileged, in that it was the report in a public journal of a judicial proceeding; that the report, in so far as it related to plaintiff, was both fair and true; and that there was no malice. Consequently it fell clearly within the provisions of subdivision 4 of section 47; and no cause of action was established. It follows that the nonsuit was properly granted.

Plaintiff alleged by innuendo that the particular portions of said article quoted in his complaint constituted a libel against him. It is well settled, however, that where the words complained of are neither ambiguous nor used in any covert sense, it is for the court to determine in the light of such extrinsic facts as are alleged whether the words are susceptible of the defamatory meaning sought to be attributed to them; and if they are not then neither inducement nor innuendo can make them a libel by ascribing a meaning to the published words other or broader than the words themselves naturally bear. (*Pollard* v. *Forest Lawn Memorial Park Assn.*, 15 Cal. App. (2d) 77 [59 Pac. (2d) 203]; *Mortensen* v. *Los Angeles Examiner*, 112 Cal. App. 194 [296 Pac. 927]; *Mellen* v. *Times-Mirror Co.*, 167 Cal. 587 [140 Pac. 277, Ann. Cas. 1915C, 766]; *Vedovi* v. *Watson & Taylor*, 104 Cal. App. 80 [285 Pac. 418].) Here the words complained of are unambiguous and used in their ordinary sense, and no extrinsic facts are alleged to justify the innuendo attributed to them by plaintiff.

The conclusion reached on the points above discussed makes it unnecessary to inquire into defendants' further contention that the publication falls also within the provisions of subdivision 3 of said section 47.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.