[Sac. No. 5602.   In Bank.   Nov. 2, 1943.]

GEORGE W. EMDE et al., Respondents, v. SAN JOAQUIN COUNTY CENTRAL LABOR COUNCIL (an Unincorporated Association) et al., Appellants.

James F. Galliano, Clarence E. Todd and Henry C. Todd for Appellants.

Mathew O. Tobriner as Amicus Curiae on Behalf of Appellants.

Rogers & Clark, Webster V. Clark, Bartley C. Crum and R. J. Hecht for Respondents.

EDMONDS, J.—During a labor dispute between George W. Emde and Lois E. Marshall, the owners of a dairy business, and Teamsters' Local No. 439, the Stockton Labor Journal published an article stating that, because of a violation of their contract with the teamsters' union, the employers had been placed upon the "We Don't Patronize" list. Certain labor organizations and their officers, against whom compensatory and punitive damages were awarded, assert that they had nothing to do with the publication of the article. As additional grounds for reversal of the judgment, they and the owners of the newspaper, who were also found liable, rely upon truth and privilege as defenses, and the questions for decision concern the scope and effect of the announcement sued upon.

At the time of the publication complained of and of the commencement of this action, as stated in the respondents' complaint, Emde and Marshall were co-partners, carrying on a dairy business under the name of Happyholme Farms. International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, a voluntary unincorporated association, was a labor union affiliated with the American Federation of Labor. Teamsters' Local No. 439, also a voluntary unincorporated association, was a labor union chartered by the international organization. The San Joaquin County Central Labor Council was a voluntary unincorporated association consisting of local trade and labor unions affiliated with the American Federation of Labor, including Teamsters' Local No. 439, and was maintained to influence public opinion in favor of organized labor.

C. C. Allen was secretary-treasurer of the local union. William J. Conboy, as international organizer of the brotherhood was in the sole and exclusive charge and control of all the affairs and activities of the local. Joseph Bredsteen and W. R. Tosh, doing business under the firm name of Bredsteen and Tosh, were publishers of the Stockton Labor Journal, which was a weekly newspaper, devoted to the interests of organized labor, and the duly authorized organ of the labor council for publishing its pronouncements and communicating its activities to the public and to all union members and sympathizers in San Joaquin County.

According to the complaint, these labor organizations and individuals "printed and published in said Stockton Labor Journal" an article reading as follows:

### "HAPPYHOLME DAIRY VIOLATES CONTRACT WITH TEAMSTERS

"UNIONISTS URGED NOT TO PATRONIZE BY LOCAL COUNCIL

"Action Comes After Three Months' Negotiations Fail to Bring Peaceful Settlement from Operators.

"Because it had violated its signed agreement with Teamsters Local 439, hiring non-union drivers and initiated a destructive labor policy, the Happyholme Dairy, located on the Sacramento Road at Lodi and serving the entire Stockton area, was placed on the official 'We Don't Patronize' list of the San Joaquin County Central Labor Council Monday night.

"All friends of organized labor are urged not to patronize this dairy. All other milk distributors in Stockton are operating on a union-basis, so there is no excuse for dealing with a non-union firm.

"According to officials of the Teamsters Union, the Happyholme dairy had been working under an agreement with the organization for several months. On July 1, however, while the contract was still in force, the management openly violated its word by hiring non-union milk wagon drivers.

"In addition, drivers were made to furnish their own vehicles and were put on a straight commission plan. This move wiped out the minimum wage guarantees established in the agreement with the Union, although the status of the drivers as employes of the dairy remained unchanged. The destruction of wage minimums is a threat to gains made by organized labor throughout the district.

"A peaceful settlement of the difficulty has been sought for three months by the Teamsters Union, but the dairy managers have refused to make any concessions. Their persistent refusal to work out a mutually satisfactory arrangement has forced the Union and the Central Labor Council to deny the dairy the patronage of organized labor.

"In Stockton, the Happyholme Dairy operates out of the Bobb Inn, 1147 North El Dorado, a non-union eating place.

"All friends of labor now getting milk from the Happy-holme dairy are urged to take their patronage elsewhere immediately and thus help maintain union-established and union-protected wage scales and working conditions."

By this article, the complaint continues, the appellants meant that the respondents had violated their agreement with the local union. In failing to keep their promise to employ only members of it at the scale specified by the contract, they were dishonest and had failed to perform their legal obligations. The owners of the dairy are operating a non-union business, and are opposed to organized labor, whereas all other persons conducting similar businesses are conforming to the union agreement. The appellants also meant, says the complaint, that Emde and Marshall had persistently refused to work out any mutually satisfactory arrangement with the local, and in order to protect union wage scales and working conditions in Stockton, it was necessary for all members of unions and their sympathizers to withdraw patronage from the respondents.

The article was false and defamatory in each of these particulars, the complaint charges, and was printed and published by the appellants, wickedly and maliciously and with full knowledge of its falsity on the part of each of them, with the intent and design to injure the owners of the dairy in their occupation and to destroy their business. Categorical denials of the truth of each statement in the article follow.

Concerning the damage claimed to have been suffered, the value of the dairy is placed at $25,000, and it is asserted that the profit, and in fact the very existence of the business, directly depends upon the good will of purchasers of milk and milk products in San Joaquin county. By reason of the publication, certain named customers ceased to patronize the dairy, at a loss of $1,900, computed on an annual basis; a number of persons unknown to the respondents who had formerly been purchasers of Happyholme products withdrew their patronage, occasioning a further loss of $1,348 on the same basis. Further damage in an annual amount of $3,613 is charged because three wholesale customers discontinued business relations. The respondents valued the asserted general injury to their business and reputation at $25,000 and demanded $10,000 additional as exemplary damages because

of the express malice on the part of the appellants, and each of them.

The unions, Allen and Conboy joined in an answer which admitted the allegations concerning the existence and general purposes of the labor organizations. The pleading also conceded that Allen and Conboy held the offices and performed the duties specified by the complaint. But all of the respondents' other charges were denied although it was stated that the article pleaded in the complaint "appeared or was published or printed in the Stockton Labor Journal."

Joseph Bredsteen, "individually and as co-partner of the firm of Bredsteen & Tosh," in part for the reason of lack of information or belief, denied all of the allegations of the complaint except those relating to ownership of the Stockton Labor Journal but admitted publication of the article. By amendment of his answer, Bredsteen pleaded as special defenses the truth of the words claimed to be defamatory and that their publication was privileged in that it constituted a communication, without malice, to members of organized labor by one also interested in its purposes. Furthermore, says the answer, Bredsteen stood in such relation to the members of organized labor as to furnish reasonable ground for supposing that the motive for the communication was at all times innocent. Another defense pleaded is that he made the communication at the request of organized labor in San Joaquin county, who were the persons interested in it. The answer also asserts that the item complained of was published without malice.

The labor organizations and their officers, by stipulation, filed an amended answer also pleading truth and privilege as defenses. Further, they alleged that, prior to the publication, the respondents and Local No. 439 were parties signatory to a collective bargaining agreement concerning milk wagon drivers, which provided that no employee should be required or permitted to make any written or verbal contract in conflict with it. The respondents had three milk routes, and made an agreement with some of their drivers whereby each of them purchased one of the dairy's trucks and distributed milk on a commission basis.

Upon the issues framed by these pleadings, a jury returned a verdict awarding Emde and Marshall compensatory damages of $15,000 and $5,500 punitive damages against the

unions and the individuals charged with responsibility for publication of the article. On motion for a new trial the amount of the compensatory damages was reduced to $7,000. Separate appeals were taken from the judgment and the orders denying motions for judgment notwithstanding the verdict.

The unions and their officers contend that none of them procured the publication of the article said to be libelous. All of the appellants insist that the article was not libelous *per se* or by innuendo; that it was true, publication was privileged, and no express malice was either pleaded or proved. On the issues of damages, they argue that there is no proof of any damage suffered by the respondents as the result of the publication, nor any basis for awarding punitive damages against all of them.

The respondents assert that by the plea of privilege the labor organizations and their officers admit procuring publication of the article sued upon. And the evidence shows, they say, that the unions were engaged in a combination to injure them, and Allen and Conboy brought about the publication of the article in furtherance of that purpose. They also insist that all of the appellants are responsible for the publication, which was false and libelous *per se,* even though it was made in the course of a labor dispute. And the allegations of the complaint charging malice on the part of each of the appellants is supported by the evidence, which defeats a defense of qualified privilege and justifies the award of punitive damages.

The controversy between the parties originated when the dairy changed the method of distributing milk to its customers. There is no dispute concerning the essential facts. It appears that in November, 1937, the respondents and three other employers engaged in the same business at Stockton signed an agreement with the International Brotherhood and the local union covering wages and working conditions of employees. By this agreement, which was for a one-year period, drivers were to be paid $160 per month with additional amounts for overtime and requirements concerning hours when deliveries should be made, payment for uniforms and other working conditions. A provision of the agreement was: "No employee shall be required or permitted to make any written or verbal contract that will conflict with this agreement."

In May, 1938, Emde and Marshall were distributing their product on three routes. Through their manager they proposed that the drivers of these routes take them over and thereafter operate as "independent contractors." Two of the three drivers, all of whom were then members of Local 439, agreed to do so; the third man preferred to continue under the conditions then existing. By the middle of June, except for minor details, an agreement was worked out. It was stated in letters of the same form, dated June 30th, addressed to the Stockton Savings and Loan Bank, and signed by each of the two union drivers who had decided to accept the new arrangement. By his letter, each of them applied for a loan to be evidenced by a promissory note guaranteed by Happyholme dairy. According to the letter, the applicant was to use the money borrowed by him to purchase "the milk truck which he is presently using as an employee of Happyholme Farms in delivering its milk to its customers in the route or territory which he is working" and also "the total accounts receivable due it from its customers" served in that area.

During the negotiations concerning the proposed contracts, the officers of the local union had heard of the contemplated transactions and liked no part of them. Prior to July 1st, by telephone, both Allen and Conboy had discussed the matter with the dairy's manager, and each of them had endeavored to dissuade the two drivers from undertaking the new arrangement. Shortly after July 1st, the union took these drivers' union cards from them. By July 20th one of the men who had applied to the bank for a loan to finance the distribution contract decided that he would give up the route he was operating. According to his testimony, this was due to threats made by the union officials to him. One of the ranch hands employed by the dairy asked for this route, and on July 23d he and the former union driver went to the bank and each signed a promissory note, a conditional sale contract for the purchase of a dairy truck then owned by the dairy, and a distribution contract. The man who was to distribute the Happyholme products on the third route was ill at that time, but later he signed a note and contracts in the same form as those executed by the other two. Each of the three men was licensed by the California Department of Agriculture as an independent milk distributor.

In an attempt to settle the dispute according to the procedure specified by the union contract, the matter was submitted to a committee having three representatives from each side. It met on August 23d and the question at issue was stated as: "Are present operators of Happyholme routes employees of Happyholme?" The three employer representatives voted in the negative and the three persons representing the union in the affirmative. On September 26th the Central Labor Council placed the dairy on the unfair list and four days later the offending article was published.

■ Although the publicizing of the facts of a labor dispute in a peaceful manner is within the liberty of free discussion guaranteed by the Fourteenth Amendment to the United States Constitution, a party to the controversy has no absolute privilege to discuss such matters so as to avoid civil responsibility for injury to another caused by a malicious and false statement made in the course of the differences between them. (See *Washer* v. *Bank of America*, 21 Cal.2d 822, 832, 833 [136 P.2d 297].) ■ Because, however, the peaceful settlement of labor contention is a matter of vital public concern, the parties to such a controversy must be accorded the right to make fair comment upon the facts involved, at least so long as the criticism is based upon a true or privileged statement of fact. (See *Snively* v. *Record Publishing Co.*, 185 Cal. 565 [198 P. 1]; 3 Rest., Torts, sec. 606; 33 Am.Jur., Libel and Slander, sec. 161, p. 155; for a discussion of the conflict as to whether the right of public discussion is limited to comment or opinion, or whether it in addition extends to false assertions of fact made with an honest belief in their truth, see Prosser on Torts [1941], sec. 94, pp. 839, 840; note, 10 So.Cal.L.Rev. 520, 521, 522; 33 Am.Jur., Libel and Slander, sec. 162, p. 156.) Even greater protection is accorded one who makes a statement, in a reasonable manner and for a proper purpose, to persons having a common interest with him in the subject matter of the communication, when the publication is of a kind reasonably calculated to protect or further it. (Civ. Code, sec. 47, subd. 3; 3 Rest., Torts, sec. 596; Prosser on Torts, sec. 94, p. 837; see also 3 Rest., Torts, secs. 594, 595.) For this conditional privilege extends to false statements of fact, although the occasion may be abused and the protection of the privilege lost, by the publisher's lack of belief, or of reasonable grounds for be-

lief, in the truth of the defamatory matter, by excessive publication, by a publication of defamatory matter for an improper purpose, or if the defamation goes beyond the group interest.

■ The peaceful inducement of both the public generally and of union members in particular to boycott an employer who is party to a labor controversy, is a form of economic pressure which labor organizations may properly employ in pursuit of a lawful end. (*C. S. Smith Met. Market Co.* v. *Lyons*, 16 Cal.2d 389, 395 [106 P.2d 414]; *McKay* v. *Retail Auto S. L. Union No. 1067*, 16 Cal.2d 311, 326, 327 [106 P.2d 373].) ■ And it may not be denied that the particular controversy between the dairy and the union in the present action, involving as it does the dissatisfaction of organized labor with a system of distributing milk products which avoids minimum wages and hours, workmen's compensation and social security benefits, is a legitimate matter of labor dispute. (*Bakery & P. Drivers Local* v. *Wohl*, 315 U.S. 769 [62 S.Ct. 816, 86 L.Ed. 1178]; *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products*, 311 U.S. 91 [61 S.Ct. 122, 85 L.Ed. 63].) Therefore, the union, and those directly interested in and connected with the labor cause, had the right to urge the public and, of course, the members of organized labor, to refrain from buying the dairy's products unless the dairy abandoned the system of distribution which it had undertaken and rehired union drivers in accordance with the terms of the existing contract, whether or not the employer-employee relation then existed between the members of the union and the dairy. (*American Federation of Labor* v. *Swing*, 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed. 855]; *C. S. Smith Met. Market Co.* v. *Lyons, supra*, at p. 401; *McKay* v. *Retail Auto. S. L. Union No. 1067, supra*, at pp. 326, 327.) Of course, as a result of the lawful application of economic pressure, the resisting employer may suffer definitely ascertainable damage for which he may obtain no legally recognized compensation from those inflicting it. (*C. S. Smith Met. Market Co.* v. *Lyons, supra*, at pp. 398, 399.)

In the light of these factors, the difficulties in determining when the conditional privilege of capital and labor to express their views on labor controversies has been abused and in segregating the compensable items of damage from the noncompensable are readily apparent. And since such disputes, realistically considered, normally involve considerable dif-

ferences of opinion and vehement adherence to one side or the other, a necessarily broad area of discussion without civil responsibility in damages is an indispensable concomitant of the controversy.

Summarizing the uncontradicted facts underlying the publication which is the basis for the present suit, it appears that the dairy, notwithstanding its contract with the union, decided to change its method of operation and negotiated with the union drivers then in its employ to distribute milk to the same customers on the same routes upon a different basis. Under the new plan, the drivers were to buy from the dairy the trucks which were then being used in servicing the existing routes, although the dairy agreed to repurchase them upon termination of the agreement. The drivers were to purchase the milk for their deliveries from the dairy at the published retail and wholesale prices posted with the Director of Agriculture, less specified discounts, although they were given the right to return and receive credit for undisposed products so long as the returns did not exceed a "reasonable" amount. Whenever the agreement was concluded, the dairy agreed to buy the uncollected but collectable accounts from the drivers. The contracts prohibited the "distributor" from selling, transferring or disclosing to any one the names, addresses, or requirements of the customers on his route, and from handling competing products on his route or in any other area. Furthermore, each driver agreed to return to the dairy all route books and customers' lists in his possession and to refrain from engaging in the distribution of dairy products or in the soliciting of patronage therefor either on his own or another's behalf in the route covered by the agreement for a period of two years following the termination of the arrangement. The drivers also were required to use only the telephone number of the dairy in their business and to handle all telephone calls through the dairy's headquarters at the Bobb Inn. As "distributors" the route men had no minimum wage, nor were their hours of delivery regulated under the new plan as they were under the then existing contract with the union.

Of the three union drivers working for the dairy, although two at first agreed to accept the dairy-proposed arrangement, only one of them signed the dairy's contract and distributed milk in accordance with its terms. Because of his failure to accede to the union's objections to the new plan,

this man's union card was lifted, and neither of the two new drivers was a union man. During the subsequent negotiations. in which the union sought to induce the dairy to abandon the new arrangement, although the dairy had considered, as a means of settling the difficulty, the inclusion of a minimum wage guarantee in its contracts with the drivers, it finally decided not to do so. After this impasse was reached, the dairy was placed upon the unfair list of the San Joaquin County Central Labor Council.

Measuring these facts against the published statement of them, the difference is largely a matter of interpretation or opinion. The statements contained in the newspaper fall generally into statements of probative fact, conclusions of fact, and conclusions of law. For example, no element of personal interpretation is included in the statements that the dairy was placed on the "We Don't Patronize" list of the San Joaquin County Central Labor Council on the specified date; that the dairy and the Teamsters' Union for several months had been working under an agreement which was still in force on July 1; and that, since July 1, the drivers were required to furnish their own vehicles. And these facts are undeniably true.

Statements of fact involving an element of opinion, however, include the following: The dairy on July 1 hired non-union milk wagon drivers, and, under the new arrangement, the drivers were put on a straight commission plan. The word "hired" is to some extent an opinion but, in any event, is justified regardless of whether the drivers under the new arrangement be considered as employees or independent contractors. An equally permissible conclusion is that since at least one route man under the new arrangement had no union card on July 1, and since at the time of and for some days before the publication of the article, all three servicing the dairy's routes were not members of the union, the dairy was "hiring" non-union milk wagon drivers. And the words "straight commission plan" do not inaptly describe the financial arrangement whereby the drivers were to buy the dairy products necessary for their routes at a specified retail or wholesale price, less a designated discount.

In instituting this plan, continues the article, the minimum wage guarantees established by the union were "wiped out," although the status of the drivers as employees of the dairy remained unchanged. As there was no minimum

wage guarantee under the new arrangement, the first clause of this sentence is obviously not false. The second clause involves the statement of an opinion as to a mixed question of law and fact. Considering the limited powers of the distributor and many qualifications in the contracts prepared by the dairy, the status of the men who had signed them presents a difficult legal question (see *Pacific Lbr. Co.* v. *Industrial Acc. Com.*, 22 Cal.2d 410 [139 P.2d 892]). Under these circumstances, the position of the union in maintaining that the drivers were employees and not independent contractors was certainly within the area of fair comment upon an undisputed factual basis. The assertion that the status of the drivers as employees of the dairy "remained unchanged" must be considered in the light of the preceding statements relating the changes as to the manner of compensation and ownership of the vehicles. So viewed, the only reasonable conclusion is that the article merely meant that the same routes were being serviced by men in a similar physical manner as under the union contract.

The newspaper's comment, "A peaceful settlement of the difficulty has been sought for three months by the Teamsters Union, but the dairy managers have refused to make any concessions," also truthfully reports the facts stated within permissible limits. Unquestionably, at several different times, the union's officers presented their objections to the use of the distribution contracts. They joined in the appointment of arbitrators to determine the question in controversy. And the dairy finally refused to pay the "distributors" a minimum amount each month. This was at least one concession considered and refused.

The declaration that the dairy had "initiated a destructive labor policy" should be read in connection with the subsequent observation, "The destruction of wage minimums is a threat to gains made by organized labor throughout the district." Such a statement is similar to the designation "unfair to organized labor." █ Although some conflict exists upon the question (see *Consolidated Terminal Corp.* v. *Drivers, etc., Union,* 33 F.Supp. 645, 650; *Axton-Fisher Tobacco Co.* v. *Evening Post Co.*, 169 Ky. 64 [183 S.W. 269, Ann.Cas. 1918C 560, L.R.A. 1916E 667]), by far the preponderance of judicial decisions supports the rule that the use of the word "unfair" in connection with labor controversies does not impute want of moral integrity or business capacity, but

merely is a characterization of an employer who refuses to conduct his business in the manner desired by the union. (*J. F. Parkinson Co.* v. *Building Trades Council,* 154 Cal. 580, 592 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A.N.S. 550]; *C. S. Smith Met. Market Co.* v. *Lyons, supra,* at p. 395; *Blossom Dairy Co.* v. *International Brotherhood of Teamsters,* —— W.Va. —— [23 S.E.2d 645, 650]; *John R. Thompson Co.* v. *Delicatessen & C. W. Union, Local 410,* 126 N.J.Eq. 119, 123 [8 A.2d 130, 133]; *Cinderella Theater Co.* v. *Sign Writers' Local Union,* 6 F.Supp. 164, 172; *Watters* v. *Retail Clerks' Union No. 479,* 120 Ga. 424, 427 [47 S.E. 911, 912]; *Labor Review Pub. Co.* v. *Galliher,* 153 Ala. 364, 373, 374 [45 So. 188, 191, 15 Ann.Cas. 674]; *Campbell* v. *Motion Picture Mach. Operators' Union,* 151 Minn. 220, 226 [186 N.W. 781, 785, 27 A.L.R. 631]; *Steffes* v. *Motion Picture Mach. Operators' Union,* 136 Minn. 200, 202 [161 N.W. 524]; 1 Teller, Labor Disputes and Collective Bargaining [1940], sec. 126, pp. 389-392; and *cf. Sullivan* v. *Warner Bros. Theatres,* 42 Cal. App.2d 660, 663 [109 P.2d 760, 762].) ▮ Upon analogy, the designation of an employer's labor policy as a ''destructive'' one merely indicates that it is a practice which does not meet with labor's approval. Such language cannot be made the basis of an action for libel so long as it is occasioned, as in the present case, by the existence of a bona fide labor controversy. And as the United States Supreme Court has recognized that the application of economic pressure by labor to induce an employer to abandon the ''peddler'' system is the pursuit of a legally justifiable end (*Bakery & P. Drivers Local* v. *Wohl, supra; Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, supra*), the inclusion of the statements in the newspaper article urging all friends of labor to discontinue their patronage of the dairy ''and thus help maintain union-established and union-protected wage scales and working conditions,'' was justified by the aim of the union to insure the maintenance of a minimum wage for the drivers delivering the dairy's milk.

▮ The only remaining statement subject to challenge is that the dairy violated its contract with the union. Again, the question of violation of contract is a legal conclusion, but, by innuendo, the respondents have pleaded that the publication was intended to convey the charge that the respondents were dishonest. An innuendo, however, cannot ascribe a meaning to assertedly defamatory matter other or broader

than the words themselves naturally bear; it cannot add to, enlarge, or change the sense of the published words. (*Bates v. Campbell*, 213 Cal. 438, 442, 443 [2 P.2d 383]; *Chavez v. Times-Mirror Co.*, 185 Cal. 20, 25 [195 P. 666]; *Grand v. Dreyfus*, 122 Cal. 58, 62 [54 P. 389]; *Jackson v. Underwriters' Report, Inc.*, 21 Cal.App.2d 591, 597 [69 P.2d 878]; *Pollard v. Forest Lawn Mem. Park Assn.*, 15 Cal.App.2d 77, 81 [59 P.2d 203]; *Vedovi v. Watson & Taylor*, 104 Cal.App. 80, 88 [285 P. 418]; *Pyper v. Jennings*, 47 Cal.App. 623, 635 [191 P. 565]; *Pollock v. Evening Herald Pub. Co.*, 28 Cal. App. 786, 788 [154 P. 30]; *Des Granges v. Crall*, 27 Cal.App. 313, 315 [149 P. 777].)

 Restating the facts underlying the asserted breach of contract, it appears that, despite the clause that no employee of the dairy "be required or permitted to make any written or verbal contract that will conflict with the agreement," while the union contract was in effect the respondents suggested that the union drivers enter into this new arrangement, under which there would be no minimum wage guarantee. Two of the union drivers orally agreed to become parties to the new proposal, and one of the two actually entered into it. To this extent the dairy violated the union contract. And in urging that the appellants did not rely upon such action as constituting the violation of contract referred to in the article until after the trial of the action, the respondents ignore the rule that it is immaterial whether the publisher believed his statements were true at the time they were made, so long as they in fact were true. (3 Rest., Torts, sec. 582, comment g; Prosser on Torts, sec. 95, p. 854; 33 Am. Jur., Libel and Slander, sec. 117, p. 118.)

 More open to question, however, is the specific charge that "while the contract was still in force, the management openly violated its word by hiring non-union milk wagon drivers."  It is generally agreed that it is not necessary to prove the literal truth of an allegedly libelous accusation in every detail, so long as the imputation is substantially true so as to justify the "gist" or "sting" of the remark. (*Hearne v. DeYoung*, 119 Cal. 670 [52 P. 150, 499]; *Kurata v. Los Angeles News Pub. Co.*, 4 Cal.App.2d 224, 227 [40 P.2d 520]; *Mortensen v. Los Angeles Examiner*, 112 Cal.App. 194, 203 [296 P. 927]; *Skrocki v. Stahl*, 14 Cal.App. 1, 5 [110 P. 957]; 3 Rest., Torts, sec. 582, comment e; Prosser on Torts, sec. 95, pp. 855, 856.)  And, in the present action, it may not be

denied that, while a contract existed between the Teamsters' Union and the dairy requiring that drivers should be members of Local 439, the employers put into effect a plan under which union men could not continue their employment. Such an interpretation may fairly be characterized as the "gist" of the charge, or at least within the permissible limitations of fair comment.

But even if the charge of violation of contract were false insofar as it referred to the hiring of non-union employees, since the comment was published in a newspaper devoted exclusively to the interests of organized labor, its publication was conditionally privileged. (Civ. Code, sec. 47, subd. 3; *Bereman* v. *Power Publishing Co.*, 93 Colo. 581 [27 P. 2d 749, 92 A.L.R. 1024] ; note, 92 A.L.R. 1029-1032.) The communication being qualifiedly privileged, no right of action arose unless the publishers were actuated by malice, and malice "is not inferred from the communication or publication." (Civ. Code, sec. 48; *Bereman* v. *Power Publishing Co.*, *supra;* *Cooksey* v. *McGuire*, (Tex.Civ.App.) 146 S.W.2d 480, 483.) And the record shows no evidence which supports a verdict upon that ground.

The asserted republication of the article in two subsequent issues of the labor journal consisted of nothing more than legitimate "follow-up" stories to inform the recipients of the paper of continuing developments in the controversy. Furthermore, one of the two articles specifically states that the "dairy says it has sold its routes in good faith," thus giving the employer's version of the dispute. And the testimony that Conboy told the respondents' business manager that if the new plan was not abandoned "You will never sell much milk," and that "We are going to make them take them back," discloses only an adherence to the legitimate purpose of exercising labor's power of compulsion to induce the dairy to accede to the union's demands. Nothing in the testimony indicates a want of belief upon the part of any one of the appellants in the statements contained in the publication; on the contrary, it reveals that they uniformly and consistently in good faith believed in the propriety and truth of their position. If the dairy considered the union publicity to be unfair or misrepresentative, its remedy was to answer the charges by counter-publicity of its own, for the constitutional right of free speech is just as clearly a right

of employers as of employees. (*National Labor Relations Bd. v. Reed & Prince Mfg. Co.*, 118 F.2d 874, 889; *National Labor Relations Bd.* v. *Ford Motor Co.*, 114 F.2d 905, 913-915, cert. den., 312 U.S. 689 [61 S.Ct. 621, 85 L.Ed. 1126].)

The judgment is reversed.

Gibson, C. J., Carter, J., Traynor, J., and Schauer, J., concurred.

CURTIS, J.—I dissent. This action was tried by a jury, and a verdict was returned in favor of the plaintiffs for both compensatory and punitive damages. The appeal is from a judgment, modified in amount only, rendered upon said verdict. All questions of fact in the case supported by substantial evidence are foreclosed by reason of the verdict of the jury.

The published article which it is claimed was libelous was the outgrowth or, it might be properly said, was the culmination of a dispute between the plaintiffs and various labor groups represented by the defendants. This dispute followed certain transactions by which the plaintiffs purported to sell to each of three individuals, one of whom had been in the employ of the plaintiffs as a driver of one of their milk routes, a truck which had previously been used by the plaintiffs in the delivery of milk in the city of Stockton. It was claimed by defendants that this transaction was not a bona fide sale of the trucks, but was a mere subterfuge whereby the plaintiffs sought to evade certain obligations as employers, such as minimum wages which they were under agreement to pay their drivers, and workmen's compensation, unemployment benefits and other advantages to which an employee is entitled under the law of this state. On the other hand, the plaintiffs contended that the transactions in dispute were bona fide sales of their trucks to the three individual vendees, and that the latter in the operation of their respective trucks were no longer their employees but independent contractors. Whether these transactions were or were not actual sales of the trucks was a question of fact for the jury, and its verdict in favor of the plaintiffs was a finding that the transactions were bona fide sales and the purchasers of the trucks in their subsequent operations delivering milk over the three routes were not employees of plaintiffs.

The plan under which the plaintiffs proposed to dispose of their milk by means of the sale thereof in wholesale quan-

tities to truck owners, who resold the same at retail to milk consumers, has been referred to as the "vendor system," and it has been held, as stated in the majority opinion, that the application of economic pressure by labor to abandon such a system is the pursuit of a legally justifiable end, citing among other cases *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products Inc.*, 311 U.S. 91 [61 S.Ct. 122, 85 L.Ed. 63]. Had the published article been confined to statements charging that the plaintiffs had adopted such a plan of doing business, no contention could be made as to its truthfulness, and under the decision last mentioned, the defendants would have been justified in publishing an article embodying the facts of that controversy. But a reading of the article shows that no mention is made of this new plan under which the plaintiffs were then doing business, but certain definite and positive statements were made regarding the plaintiffs which they now contend were false and maliciously made, and accordingly libelous.

Among these alleged libelous statements appearing in said article the following may be mentioned: 1. Happyholme Dairy violates contracts with teamsters. 2. Because it had violated its signed agreement with Teamsters Local 439. 3. Hired non-union drivers. 4. Drivers were made to furnish their own vehicles. 5. Drivers were put on a straight commission plan. 6. The status of the drivers remained unchanged. 7. The management (Happyholme Dairy) openly violated its word by hiring non-union milk wagon drivers.

The last statement will first be given consideration. There can be no question that if this statement was false and unprivileged, it was libelous, and not even by the most ingenious course of reasoning may it be made to appear otherwise.

In the latest attempt of this court to define libel correctly as defined by section 45 of the Civil Code it is stated that " 'Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.' (Civ. Code, sec. 45.) . . . These definitions have been held to include almost any language which, upon its face, has a natural tendency to injure a person's reputation, either generally, or with respect to his occupation. (*Bates* v. *Campbell*, 213 Cal. 438, 441 [2 P.2d 383]; *Stevens* v. *Snow*, 191 Cal. 58, 62 [214 P. 968]; *Schomberg* v. *Walker*, 132 Cal. 224, 227 [64 P. 290]; *Tonini* v.*Cevasco*, 114 Cal. 266, 272 [46 P. 103]); and words

clearly conveying a meaning within one of the statutory categories are actionable *per se.*" (*Washer* v. *Bank of America* (1943), 21 Cal.2d 822, 827 [136 P.2d 297].)

That the statement charging that plaintiffs had openly violated their word by hiring non-union milk wagon drivers was false is practically conceded by the majority opinion. But the opinion holds "that it is not necessary to prove the literal truth of an allegedly libelous accusation in every detail, so long as the imputation is substantially true so as to justify the 'gist' or 'sting' of the remark." The "sting" in the accusation against plaintiffs was that they violated their word. The evidence shows that while under their contract with the local union to employ only union drivers, plaintiffs sold all their trucks to third persons so that thereafter they had no need of drivers, and did not thereafter employ in their business any drivers, either union or non-union. Proof of plaintiffs' sale of their trucks and that thereafter they had no need of truck drivers was not substantial or any proof of the charge that they had violated their word which was the "sting" in the article.

The majority opinion cites the case of *Hearne* v. *DeYoung,* 119 Cal. 670 [52 P. 150, 499] in support of the statement just quoted respecting the degree of proof required to show that the article claimed to be libelous was true. That case furnishes a clear illustration of just what is meant by the terms "gist" and "sting" in an article claimed to be libelous. In that case the defendant published what purported to be an account of a divorce trial between the plaintiff and his wife. The article published stated that the evidence showed that defendant committed an assault upon his wife by hurling dishes at her. It appeared at the trial of the libel action that defendant was not able to show that plaintiff in that suit committed an assault upon his wife by hurling dishes at her, but offered to prove that the evidence in the divorce action did show that defendant in said action committed an assault upon his wife by other means than hurling dishes. The trial court denied the offer and on appeal the judgment in plaintiff's favor in the libel suit was reversed. In so deciding the court held: (page 675) "The sting, the hurt to the plaintiff is found in the fact that he is charged in the publication by the evidence with having assaulted his wife. . . . Substantially stated, the charge here is that the plaintiff assaulted his wife by hurling dishes at her. Testimony at the divorce trial of an assault of any kind upon his wife, by use

of force and violence upon the part of the plaintiff, would prove the charge." In the case before us the "sting," the hurt to the plaintiffs, is found in the fact that they were charged in the article published with violating their word. Defendants were unable to prove in support of this charge that plaintiffs had hired non-union drivers, but contend that they did prove that plaintiffs, while under contract with Local No. 439 to hire union drivers only in their milk business, had sold their trucks to third parties and thereafter had no need to hire drivers for their trucks, and did not after said sales hire any driver, either union or non-union. The "sting" in the libel was the charge that plaintiffs violated their word, and proof that plaintiffs had put into effect a plan under which they would no longer need drivers cannot be said to be substantial or any proof of the charge, so as to remove the sting from the publication. The article therefore was false as found by the jury.

The majority opinion holds that even if false, the publication was conditionally privileged, and was therefore not libelous, as there was no evidence that the publication was actuated by malice, and therefore the record shows no evidence which supports a verdict in plaintiffs' favor on that ground. Said opinion holds that the asserted republication of the article in two subsequent issues of the labor journal consisted of nothing more than legitimate "follow up" stories to inform the recipients of the paper of continuing developments of the controversy. No authorities are cited in support of the above statement. Presumably none are to be found. The question is not new in this state. In the early case of *Norris* v. *Elliott*, 39 Cal. 72, a case for slander, the court at page 74 held as follows: "Nor did the Court err in admitting proof that the slanderous words were repeated after the action was commenced. This proof was offered and admitted only as a proof of malice and was competent for that purpose. [Citing authorities.]" Again this question came before this court in the case of *Chamberlin* v. *Vance*, 51 Cal. 75, also a case for slander. On page 84 of the opinion it is stated: "The words testified to by the witness Abbott, do not enlarge the meaning of the words of the complaint, if construed in accordance with the averment above recited. The words testified to by the witness were spoken after the commencement of the action, but as they were substantially the same as those declared on, they were admissible to prove the *quo animo* with

which the alleged slander was originally published. The words spoken after were of similar import to those spoken before this action was brought. They may be considered a repetition, and so were admissible on the question of malice. [Citing authorities.]'' In the case of *Harris* v. *Zanone*, 93 Cal. 59 [28 P. 845], likewise an action for slander, the law is stated as follows: (page 69) ''Upon this issue the plaintiff was at liberty to introduce any competent evidence of express malice as fully as though it had been alleged in her original complaint and denied in the answer of the defendant; and other utterances of words of similar import would be competent evidence for that purpose. (*Evening Journal Ass'n* v. *McDermott*, 44 N.J.L. 430; 43 Am.Rep. 392; *Chamberlin* v. *Vance*, 51 Cal. [75] 84; 2 Greenl. Ev., sec. 418; Townshend on Slander and Libel, sec. 392.)''

A still later case than those just cited is the case of *Hearne* v. *DeYoung*, 119 Cal. 670, 677 [52 P. 150, 499], already mentioned. Plaintiff sued to recover damages alleged to have been sustained by reason of a publication of an article claimed by plaintiff to have been libelous. The trial court admitted in evidence a second publication of the alleged libelous article made after the institution of said action. It was contended that the admission of this subsequent publication was error, but this court held to the contrary, as follows: (page 677) ''When we consider that these publications are only admissible for the single purpose of proving malice actuating the defendant in the original publication, it is difficult to see substantial reasons why the commencement of the action should be a bar to the admission of publications made thereafter; but, whatever may be the rule in other jurisdictions, in this state we deem the matter settled by the adjudications.'' The court then cites *Norris* v. *Elliott, supra, Chamberlin* v. *Vance, supra,* and *Harris* v. *Zanone, supra,* in support of its statement that the rule is deemed settled in this state.

*Davis* v. *Hearst*, 160 Cal. 143 [116 P. 530] was also to the same effect. That case was approved in *Scott* v. *Times-Mirror Co.*, 181 Cal. 345 [184 P. 672, 12 A.L.R. 1007], in the following language at page 362 and which admits of no uncertainty: ''If the evidence has such logical import, and is not otherwise incompetent, it must be received, and it is for the triers of the fact to determine the weight to be given to such evidence. The fact that it may also tend to establish the publication of other distinct libels, published either before

or after the one constituting the cause of action, is to be regarded as merely incidental and as not furnishing ground for the exclusion of the evidence. Nor is it material that other actions may thus be shown to exist against the party. Hence, where punitive or exemplary damages are sought in an action for civil libel any evidence (which in no other respect is objectionable), having a logical tendency to prove that the publication was prompted by actual malice, is material, competent, and relevant. This is the plain meaning of *Davis* v. *Hearst, supra,* and if there was any question about the state of our law on the subject prior to that decision there is none now. It is inconceivable that since the law provides for recovery upon publications made with actual malice the existence of the fact may not be established by the very best evidence—namely, evidence of other libels tending to show a malicious and vindictive attitude of mind toward the injured party. To hold otherwise would be to recognize a right in the party defamed but deny to him a full opportunity to establish and enforce it.''

In the present case there were publications both before and after the commencement of this action, so that the above rule as to their admission to prove malice applies. This evidence being admissible the question of malice then became a question for the jury. (*Scott* v. *Times-Mirror Co., supra; Clark* v. *McClurg,* 215 Cal. 279, 282 [9 P.2d 505, 81 A.L.R. 908].) The verdict of the jury cannot be construed in any other light than a finding that the statement in the published article that plaintiffs had violated their word was false and malicious. If false and malicious, it was not privileged under subdivision 3, section 47 of the Civil Code, or under any other provision of said section, or under any other law of this state. This finding being supported by substantial evidence is therefore binding on this court.

Other testimony in the record supporting the finding of the jury that the article was published maliciously relates to the statement made by Conby to the plaintiffs that if the new plan was not abandoned ''You will never sell much milk.'' In other words it was a threat to ruin the business of the plaintiffs, which the evidence shows represented an investment of over one hundred thousand dollars, and by which the plaintiffs were supplying a large portion of the inhabitants of the city of Stockton with fresh milk, and employing a number of employees in addition to the former drivers of

their trucks. These words could not have been spoken in response to any feeling of good will or indifference toward the plaintiffs. They clearly indicate but one sentiment and that was a feeling of ill will and resentment against the plaintiffs, an intention and willingness to vex and hurt those who opposed the wishes of the person uttering them. Their utterance clearly indicated a malicious intent on the part of the latter. "Malice in fact is a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person." (16 Cal.Jur. 33, sec. 10.)

From what has been said above, it is clear that the statement in the published article that the plaintiffs had violated their word was false and malicious. It is therefore not necessary to go into detail respecting the other statements set out in the previous part of this dissent which were of the same general character as that just discussed. While it may be that they were less injurious and therefore less objectionable, they were nevertheless uttered with the same disregard for truthfulness and with the same willingness to injure the person against whom they were directed. The same penalty must therefore be visited upon those responsible for their publication as is imposed for the publication of the more serious and more objectionable matter set forth in the published article.

While not discussed in the majority opinion, the contention is made by the defendants other than the publishers of the Labor Journal that, conceding all that is said regarding the libelous character of the published article, there is no evidence that said defendants either printed or published, or procured its publication.

The evidence in this case shows that for some three months before the boycott was declared, these defendants were working together in order to persuade the plaintiffs to abandon their new plan of doing business. They held several meetings in which all were present. They had interviews with the plaintiffs and the latter's employees, and the new drivers of plaintiffs' trucks. Finally after all their efforts failed, and as a result of the combined efforts of these defendants, it was found necessary to declare a boycott and one was declared against the plaintiffs. But declaring the boycott would have but slight effect upon plaintiffs' business unless the union labor people of the vicinity were informed of that fact. The most effective way to reach these people was through the columns of the Labor Journal. It was not only the official

organ of the Labor Council, but was taken by the union labor people generally throughout the city of Stockton and nearby communities. The published article appeared in the Labor Journal immediately after the boycott was declared. The only reasonable inference to be drawn from this evidence is that the article was published by these defendants. They were the only persons interested in its publication, and its publication was necessary in order to make effective the boycott which they had declared against the plaintiff. The verdict of the jury finding that these defendants published said article in my opinion is fully supported by the evidence. If the findings of the fact finding body are supported by inferences which may be fairly drawn from the evidence, the reviewing court is without power to disturb such findings. (*Pacific Lumber Co.* v. *Ind. Acc. Com.*, 22 Cal.2d 410, 422 [139 P.2d 892].)

In closing it may be appropriate to call attention to a statement in the dissenting opinion by Chief Justice Stone in which Justices Roberts and Frankfurtur concurred in the case of *Schneiderman* v. *United States,* 320 U.S. 118 [63 S.Ct. 1333, 87 L.Ed. 1796]. On page 1358 [63 S.Ct.] will be found the statement referred to and which is as follows: "I think these findings are abundantly supported by the evidence, and hence that it is not within our judicial competence to set them aside—even though, sitting as trial judges, we might have made some other finding. The judgment below, cancelling petitioner's citizenship on the ground that it was illegally obtained, should therefore be affirmed. The finality which attaches to the trial court's determinations of fact from evidence heard in open court, and which ordinarily saves them from an appellate court's intermeddling, should not be remembered in every case save this one alone."

In my opinion the judgment should be affirmed against all of the defendants.

Shenk, J., concurred.

Respondents' petition for a rehearing was denied November 29, 1943. Shenk, J., and Curtis, J., voted for a rehearing.